**Affirmed and Memorandum Opinion filed April 26, 2012.**



In The

# Fourteenth Court of Appeals

### NO. 14-12-00022-CV

## IN THE INTEREST OF A.H.A., M.O.A., D.J.A., E.A.A.A., J.J.A.A., L.E.F., R.E.F., AND J.C.R., CHILDREN

**On Appeal from the 314th District Court
Harris County, Texas
Trial Court Cause No. 2010-07077J**

## MEMORANDUM OPINION

After a bench trial, the trial court signed a decree terminating Mother's parental rights to three of her eight children, and appointing the Department of Family and Protective Services as the sole managing conservator of those three children. The trial court also appointed the biological father of the other five children sole managing conservator of those children, but failed to appoint Mother possessory conservator of those children. In this accelerated appeal,[1] Mother challenges the order (1) terminating her parental rights to three of the children and (2) appointing the biological father the sole managing conservator, and failing to appoint Mother possessory conservator, of the other five children. We affirm.

---

[1] *See* TEX. FAM. CODE ANN. § 263.405 (West Supp. 2011).

BACKGROUND

Mother was born in El Salvador in 1975. She became pregnant and miscarried at age fourteen. Mother emigrated to the United States in 1992 at age sixteen and worked as a waitress in a series of night clubs because she did not have any work skills or legal documents. In 1994, she met and moved in with Carlos. Mother had three children with Carlos. Carlos was physically abusive and he frequently used cocaine, although he never induced her to use drugs. In 1998, Carlos and his mistress beat Mother and threw her out of the home. Carlos threatened to kill Mother if she contacted him or attempted to see their children. Mother has not seen those children since they were toddlers.

After finding employment in a night club, Mother met and moved in with Milton, who was jealous and threatened to hurt her if she went outside the home without him. There were multiple incidents of domestic violence, and Milton was arrested on three occasions for spousal battery. Mother had five children with Milton: A.H.A. in 1999, M.O.A. in 2000, D.J.A. in 2001, E.A.A.A. in 2002, and J.J.A.A in 2004. Milton left Mother when she was pregnant with J.J.A.A.

In 2005, Mother met and moved in with Leonel. Mother had two children with Leonel: L.E.F. in 2006, and R.E.F in 2008. Leonel moved to Tennessee where he found employment, but did not include Mother or their children in his plans to relocate.

In 2008, Mother became involved with Juan. Mother had one son with Juan: J.C.R.. in 2009. There were incidents of domestic violence, and Juan introduced Mother to the use of cocaine. In 2010, Juan hit A.H.A. several times when A.H.A. tried to intervene on behalf of Mother during a dispute, and M.O.A. called the police. In June 2010, Juan was incarcerated for injury to a child.

Mother was home at 2:00 a.m. on October 24, 2010. Mother, who was thirty-nine weeks pregnant with her second child with Juan, had drunk six beers and used cocaine. Mother began to have vaginal bleeding, and at 7:00 a.m., called EMS, and was taken to the hospital. The child was stillborn. Mother tested positive for cocaine and alcohol.

That same day, the Department received a report of neglectful supervision of eight children ranging in age from one year old to eleven years old. It was not known who was watching the eight children while Mother was as the hospital.

The Department interviewed M.O.A., D.J.A., E.A.A.A., and J.J.A.A. on October 25, 2010. They told the Department investigator that there were times they did not have food to eat and had to get food from neighbors and school. They also told the investigator about the domestic violence between Mother and Juan. When A.H.A. was interviewed, he denied not having food at home. A.H.A. also stated that Mother had been in a domestic violence dispute with Juan the previous year. A.H.A. said that when he tried to help Mother, Juan hit him several times. M.O.A. called the police, and A.H.A. had not seen Juan since then.

The Department's investigation noted two prior reports involving Mother. First, on March 26, 2009, the Department received a report of neglectful supervision of Mother's seven children. The report stated that Mother was not providing adequate supervision, "leaving them free to injure each other daily." It was found in the investigation that the children did not attend school regularly and their attendance was "very poor." There were also concerns that the children did not have enough to eat or adequate clothing. The case was given a disposition of "Unable to Locate the mother." Second, on October 21, 2009, the Department received another report of physical neglect and neglectful supervision. It was reported that the children were left home alone frequently, the home had been without electricity for four months, and the children had been going through garbage cans looking for food. The case was given a disposition of "ruled out and closed."

On October 28, 2010, the Department filed an original petition for protection of a child, for conservatorship, and termination in suit a affecting the parent-child relationship, requesting that it be appointed temporary sole managing conservator of the children without notice or an adversary hearing, and that emergency orders be entered.

On that same day, the trial court signed an order for protection of a child in an emergency, naming the Department temporary sole managing conservator of the children and setting the case for a full adversary hearing on November 11, 2010.

Following the full adversary hearing on November, 11, 2010, the trial court signed temporary orders, appointing the Department temporary managing conservator of the children and ordering Mother to comply with each requirement set out in the Department's service plan, and setting a status hearing on December 21, 2010. Mother attended the hearing, but the fathers did not—Leonel's and Milton's locations were not known, and Juan was in the Harris County Jail.

On November 22, 2010, Mother submitted to a Family Evaluation at the Children's Crisis Care Center. Mother stated that she started drinking at age 22, and she "drank throughout her multiple pregnancies," and, at the time of the evaluation, she drank eight to ten beers on Fridays and Saturdays. Mother stated that Milton exposed her to cocaine, but she began to use it with Juan in the summer of 2009. Juan would either buy the cocaine or send her to buy it. Mother stated that, on average, she would snort two little fingernails worth of cocaine on most weekends. Since Juan's incarceration, Mother had continued her weekly use of cocaine, with her supplier giving to her for free.

Mother stated that she had arranged for her eight children to be supervised by a neighbor before she was taken to the hospital on October 24, 2010. Mother "readily admit[ted] to using alcohol and cocaine throughout her recent pregnancy," but did not believe that her substance abuse had been harmful to the stillborn child.

Mother did not believe that allowing her children to play outside unsupervised was neglectful, as long as they remained on the apartment complex premises. Mother had been living in a one bedroom apartment for over ten years with her eight children. Until his arrest and incarceration in June 2010, Juan had also been living there. Mother stated that she had moved to a two bedroom apartment, subleasing the second bedroom to a friend.

4

Mother had been working for a landscaper for three months, earning $400 a week by distributing flyers. Mother stated that she relied on $1,202 per month in food stamps to support her family. Mother stated that did her best to keep food in the house, but admitted that "rations tend to run very low towards the end of the month."

It was reported that A.H.A, who was in the fifth grade, had failed the second grade and had ongoing academic and behavioral problems at school. M.O.A., who was in the fourth grade, had failed the second grade and experienced ongoing academic problems at school. D.J.A., who was in the third grade, had failed the first grade and had ongoing academic and behavioral problems at school. E.A.A.A., having failed the first grade the previous year, was repeating the first grade and had ongoing academic and behavioral problems at school. J.J.A.A., who was in the first grade, had ongoing academic and behavioral problems at school. L.E.F., who was four years old, had not attended school prior to placement and was attending pre-kindergarten classes.

After a status hearing on December 21, 2010, the trial court signed an order, providing that "Mother ordered by separate order to submit to hair follicle & U/A today," and setting the initial permanency hearing for April 26, 2011. The trial court also signed additional temporary orders to obtain return of the children, which required, among other things, that Mother complete a drug and alcohol assessment and follow all recommendations of the drug and alcohol assessment; complete a substance abuse treatment program, "if recommended by drug assessment"; complete random drug tests, which may include a hair follicle test; and remain drug-free.

On April 26, 2011, the Department filed a permanency plan and permanency progress report. According to the report, Milton and Leonel had not been located by the Department. Mother had completed parenting classes and had given a copy of the certificate to the caseworker. Mother had also given a copy of her lease and paycheck stubs to the caseworker, and had completed a drug and alcohol assessment. The report noted that the children had been in foster home placement since October 28, 2010, and

indicated that the goal was family reunification.  After a permanency hearing on April 26, 2011, the trial court signed a permanency hearing order, ordering that all previous orders issued by the court continue without modification, and set another permanency hearing for August 23, 2011.

On August 19, 2011, the Department filed a permanency plan and permanency progress report.  According to the report, Milton had been located in Memphis, Tennessee, and he was working on his family service plan in Tennessee and had enrolled in parenting classes.  The Department had referred Mother to individual therapy, a drug and alcohol assessment, and substance abuse therapy.  The report indicated that the children were still in foster placement, and the goal was family reunification.  Mother and Milton appeared at the August 19, 2011 permanency hearing.  The trial court signed an order that all previous orders issued by the court continue without modification and set a special permanency hearing for September 13, 2011.

On October 28, 2011, the trial court held a bench trial on the Department's suit to terminate and suit affecting the parent-child relationship.  At trial, Shelena Curry, a Department caseworker, testified that the children came into the Department's care after Mother gave birth to a stillborn baby and tested positive for drugs.  Curry testified that Mother was ordered in her family service plan to participate in a drug and alcohol assessment and follow all recommendations, participate in UAs, obtain and maintain housing, obtain and maintain employment, participate and complete parenting classes, participate in individual therapy to address domestic violence and grief, participate in life skill classes, and participate in an English as a second language class.

Curry testified that Mother had not completed individual therapy and had not followed the recommendation from her drug and alcohol assessment, which included random UAs, complete twelve steps, and to stay sober.  Curry testified that Mother participated in drug and alcohol individual therapy, but one of the requirements was that she continue to test negative.  Instead, Mother tested positive throughout the case, and

6

never tested negative on her hair follicle. Curry testified that Mother tried to get into the twelve-step program, but had not been able to accomplish that through no fault of her own. Curry also agreed that Mother had been willing to do whatever it takes to get off drugs. However, Mother had a relapse and used cocaine in August 2011. Curry further testified that the school reported that the children would come to school hungry and would ask for extra food to take home. Based on Curry's knowledge, the children were not being fed. In August 2011, the Department's goal changed from family reunification to termination.

Curry testified that Mother had visited the children once a month for two hours at the CPS office throughout the case, which was all Mother had been allowed. The visits were "normal," and she brought the children "something to eat." Curry testified that the children had bonded with Mother and the children told Curry that they want to be with Mother. Curry testified that Mother adores the children.

Mother admitted that her last child was stillborn because of her drug use. Mother testified that she first started taking drugs two years earlier because "it would give [her] strength because the father of the children would beat [her] up." Mother further stated that the father would beat her up so that she would take drugs. Mother testified that she took drugs at parties, leaving her children with someone else. Mother admitted that she took drugs after CPS had taken her children because she felt "lonely without [her] children." Mother got the drugs from a friend at a party. Until that time, Mother had been complying with the family service plan, and CPS had told her she was in compliance with the family service plan. Mother testified that she never took drugs in front of the children.

Mother testified that she made $400 per week cleaning houses, but she was not receiving food stamps because the children were not with her. Mother believed that $400 per week with benefits would be sufficient to support her children. Mother leased a three bedroom apartment, which CPS approved.

7

With regard to the father of the five older children—A.H.A., M.O.A., D.J.A., E.A.A.A., and J.J.A.A.—Curry testified that Milton was identified by DNA testing as the father of those children. Curry testified that it took some time to locate Milton, but he came forward and wanted the children. The Department was not seeking termination of his parental rights because he was not the reason the children were removed. Milton took the children back to Tennessee with him a week before trial on the trial court's order. Curry stated that, prior to the court's allowing Milton to take the children with him to Tennessee, he had been driving down from Tennessee continuously to visit the children. The children had bonded with their father and were comfortable with him.

Mother testified that Milton beat her, and she filed a report on three occasions. Mother further testified that Milton burned A.H.A.'s foot for tearing a work permit. Mother testified that the children called her every day and said they wanted to "come here." According to Mother, A.H.A. said that his father took him to clean offices at night and they went to the church to beg for money.

When Curry talked to A.H.A., he did not tell her that his father made him clean offices at night or that the children were begging for money at a church. A.H.A. told Curry that he was happy and he was okay. A.H.A. told Curry that no one was yelling at or hitting him. A.H.A. also said that he was eating and taking baths.

As to the three youngest children—L.E.F., R.E.F., and J.C.R.—Curry testified that Mother had given the Department the names of their alleged fathers, but the Department had not been able to locate them and, therefore, those children did not have identifiable fathers. Mother told the Department that Leonel could have gone back to El Salvador. Juan was personally served with the petition in jail, but he did not come forward or participate in the case, and the Department had not been able to contact him.

At the end of the October 28, 2011 trial, the trial court announced that it was terminating Mother's parental rights to L.E.F., R.E.F., and J.R.C. under Sections

8

161.001(1)(E) and (P) of the Texas Family Code.[2] The trial court also announced that it was terminating the rights of the unknown and alleged fathers as to L.E.F., R.E.F., and J.R.C. The trial court withheld a finding on best interest until "I understand what the placement circumstances are," and recessed the trial.

On December 1, 2011, the trial court resumed the trial and found that it was the children's best interest to terminate Mother's rights to L.E.F., R.E.F., and J.R.C. On December 20, 2011, the trial court ordered Mother's parental rights terminated as to L.E.F., R.E.F., and J.C.R. under sections 161.001(1)(E) and (P). The trial court also ordered Leonel's rights to L.E.F. and R.E.F., if any, terminated, Juan's rights to J.C.R., if any, terminated, and the unknown father's rights to those three children, if any, terminated. The trial court appointed the Department sole managing conservator of L.E.F., REF, and JCR. The trial court appointed Milton sole managing conservator of A.H.A., M.O.A., D.J.A., E.A.A.A., and J.J.A.A., but did not appoint Mother possessory conservator of those children.

## TERMINATION

In her first three issues, Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's findings of termination under sections 161.001(E) and (P) and its finding that termination is in the best interest of the children.

### Standard of Review

Involuntary termination of parental rights implicates fundamental constitutional rights. *In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980). The termination of the natural right between parents and children "is complete, final and irrevocable. *Id.* Therefore, termination proceedings are strictly scrutinized. *Id.*

Parental rights can be terminated only upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by Section 161.001(1) of the

---

[2] *See* TEX. FAM. CODE ANN. § 161.001(1)(E), (P) (West Supp. 2011).

Family Code, and (2) termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2008).

In reviewing legal sufficiency in a parental termination case, we must consider all evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *In re J.O.A.*, 283 S.W.3d at 244; *In re J.F.C.*, 96 S.W.3d at 266.

In reviewing termination findings for factual sufficiency, we consider and weigh all of the evidence. *In re J.O.A.*, 283 S.W.3d at 345; *In re J.F.C.*, 96 S.W.3d at 266. But we give due deference to the fact finder's resolution of factual questions. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). We then determine whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the allegations against the parent. *In re J.O.A.*, 283 S.W.3d at 345; *In re J.F.C.*, 96 S.W.3d at 266.

"Only one predicate finding under section 161.001 is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

### Section 161.001(1)(E)

In her first issue, Mother claims the evidence is legally and factually insufficient to support the trial court's finding of termination under section 161.001(E). Pursuant to section 161.001(1)(E), the court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the

10

physical or emotional well being of the child." TEX. FAM. CODE ANN. § 161.001(1)(E). Under subsection E, the cause of the endangerment must be the parent's conduct and must be the result of a conscious course of conduct rather than a single act or omission. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Endangerment can be exhibited by both actions and failures to act. *Id.* It is not necessary that the parent's conduct be directed at the child or that the child actually be injured; rather, a child is endangered when the environment or the parent's course of conduct creates a potential for danger of which the parent is aware but disregards. *Id.*

It is well settled that "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d at 345; *see also In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied) ("Drug use and its effect on a parent's ability to parent may establish an endangering course of conduct."); *Toliver v. Tex. Dep't of Family & Protective Servs.*, 217 S.W.3d 85, 98 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("Narcotics use, in some circumstances, may give rise to termination under section 161.001(1)(E). . . . Evidence of narcotics use and its effect on a parent's life and her ability to parent may establish that the parent has engaged in an 'endangering course of conduct.'"); *In re U.P.*, 105 S.W.3d 222, 233 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("Endangerment may include evidence of drug addiction and its effect on a parent's life and his ability to parent.").

Moreover, "[a] parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, supports a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being." *In re M.E.-M.N.*, 342 S.W.3d at 263 (internal quotations omitted) (citing *In re J.A.G.*, No. 02-10-00002-CV, 2010 WL 4539442, at *1 (Tex. App.—Fort Worth Nov. 10, 2010, no pet.) (mem. op.)); *see also In re S.K.A.*, 236 S.W.3d 875, 901 (Tex. App.—Texarkana 2007) ("Continued narcotic use after the children's removal is conduct that

11

jeopardizes parental rights and may be considered as establishing an endangering course of conduct."), *pet. denied*, 260 S.W.3d 463 (Tex. 2008) (per curiam).

Mother testified at trial in October 2011 that she had started using drugs two years earlier when Juan gave her the drugs. Mother explained that she started taking drugs because "it would give [her] strength because the father of the children would beat [her] up." Mother stated that she never took drugs in front of the children but that she took drugs at parties, leaving her children with someone else. Mother told the CPS investigator that Juan would either buy the cocaine or send her to buy it. Mother further told the investigator that, on average, she would snort two little fingernails worth of cocaine on most weekends. Since Juan's incarceration, Mother had continued her weekly use of cocaine. Mother stated that her supplier had been giving her cocaine for free. Mother further "readily admit[ted] to using alcohol and cocaine throughout her recent pregnancy," but did not believe that her substance abuse was harmful to the stillborn child. At trial, however, Mother admitted that her drug use caused her last child to be stillborn.

Curry testified that Mother had tested positive throughout the case; that is, Mother had never tested negative on her hair follicle. The amount of drugs in the hair follicle decreases over time. However, the amount increased in August 2011—after CPS had taken the children. At trial, Mother admitted that she took drugs after CPS had taken her children because she felt "lonely without [her] children." Mother got the drugs from a friend at a party. Until that time, Mother had been complying with the family service plan and CPS had told her she was in compliance with the family service plan.

In addition to Mother's drug use, Curry testified that Mother's children were being neglected. Curry testified that the school reported that "the children would come to school hungry. . . . They would ask for extra food to take home." Curry stated, based on her knowledge, that the children were not being fed. The Department's report stated that four of the children "disclosed times where they did not have food to eat. They had to get

food from the neighbors and the school," although A.H.A. denied not having food at home and having to obtain food from school and neighbors.

The Department's report similarly stated that on March 26, 2009, the Department had received a report that the mother was not providing adequate supervision—"leaving [the children] free to injure each other daily."[3] There were also concerns that the children did not have enough food to eat and adequate clothing. The report also stated that previously on October 21, 2009, the children had been left home alone on a "frequent basis," and they had been going through garbage cans looking for food. In the CPS investigation, Mother stated that she did her best to keep food in the house, but admitted that "rations tend to run very low towards the end of the month." The Department's report also noted in the CPS investigation that four of the children had failed one grade and had ongoing academic and behavioral problems.

The fact finder could consider prior CPS history of neglect of, and lack of food for, the children, and Mother's use of alcohol during all of her pregnancies, in addition to her drug use resulting in the stillbirth of her last child, and her use of cocaine after the Department had removed the children from her. *See In re C.L.S.*, No. 14-06-00762-CV, 2007 WL 2447308, at *6 (Tex. App.—Houston [14th Dist.] Aug. 30, 2007, no pet.) (mem. op.) (noting that the jury could properly consider the mother's drug history, housing instability, and continued alcohol abuse as part of a continuing course of conduct endangering the child's physical and emotional well-being). The fact finder was also entitled to consider that Mother returned to illegal drugs repeatedly to cope with stress or depression. Moreover, the Department was not required to prove that Mother used drugs in front of her children to support a finding of termination under section 161.001(1)(E). *See id.* (even assuming the truth of the assertion that the child was not present during any

---

[3] Relying on Curry's testimony that Mother had no CPS history, Mother asserts that there is no evidence of any prior CPS involvement. However, the Department's report noted two prior involvements with CPS in March 2009 and October 2009. Though they were given dispositions of "Unable to Locate the mother" and "ruled out and closed," respectively, they show nonetheless that there were prior concerns of neglect.

13

of mother's drug-related activities, the Department was not required to prove that the child was present or even born at the time of the misconduct).

We conclude that the trial court could have formed a firm belief or conviction that termination of Mother's rights to L.E.F., R.E.F., and J.C.R. is warranted under section 161.001(1)(E). We overrule Mother's first issue.[4]

## Best Interest

In her third issue, Mother claims the evidence is legally and factually insufficient to support the trial court's finding that termination is in the best interest of the children. There is a strong presumption that the best interest of the child is served by keeping the child with the natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam); *In re U.P.*, 105 S.W.3d at 230. The Department has the burden to rebut this presumption. *In re U.P.*, 105 S.W.3d at 230.

In determining whether termination is in the best interest of the child, we may consider (1) the child's desires; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the person seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). The *Holley* factors are not exhaustive, nor must all the factors be proved as a condition precedent to terminate

---

[4] Because we have found that the evidence is sufficient to support the trial court's finding of termination under subsection (E), we need not address Mother's second issue that the evidence is not legally and factually sufficient to support the finding of termination under subsection (P). *See In re A.V.*, 113 S.W.3d at 362. Moreover, we need not address the Department's cross-point requesting that we affirm the court's judgment on termination on subsections (O) and (R) of section 161.001(1)—grounds on which the trial court did not order termination—in the event that we were to find the evidence legally and factually insufficient to support termination under either subsection (E) or (P).

parental rights. *In re C.H.*, 89 S.W.3d at 27. "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *Id.*

Evidence supporting termination under section 161.001(1)(E) supports a finding that termination is in the best interest of the children. *See id.* at 28 ("While it is true that proof of acts or omissions under section 161.001(1) does not relieve the petitioner from proving the best interest of the child, the same evidence may be probative of both issues."). The evidence showed that Mother had used cocaine in her most recent pregnancy, resulting in the stillbirth of that baby. Although Mother claimed that she did not use drugs in front of her children, she left them with other people while she was at parties using cocaine. Juan would send her to the dealer to obtain cocaine, and even after Juan's incarceration, Mother obtained cocaine for free from the dealer. The evidence further showed that the children did not have adequate food such that they were searching garbage cans for food. Mother admitted that "rations" ran low at the end of the month. Four out of five of Mother's school age children had repeated a grade and all five had ongoing academic and behavior problems at school.

For cases in which the Department or another government agency is the petitioner, Section 263.307(a) of the Texas Family Code provides that "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a) (West 2008). Section 263.307(b) lists the factors to consider in determining whether a parent is "willing to provide the child with a safe environment." *Id.* § 263.307(b). Those factors include: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and

15

intervention by the department or other agency; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is some history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. *Id.*

The first, third, seventh, eleventh, and twelfth statutory factors are relevant to the best-interest inquiry. Mother's three youngest children, L.E.R., R.E.F., and J.C.R., ranged in age from 16 months old to four years old when the Department took them from Mother. The three youngest were completely dependent upon Mother for their care. The evidence showed that Mother used cocaine on weekends on a regular basis, leaving her children to the care of others while she used cocaine at parties. Mother also drank throughout all of her pregnancies. Mother remained in an abusive relationship with Juan, who hit A.H.A., resulting in Juan's incarceration. Even though Mother claimed that using cocaine gave her strength in her abusive relationship with Juan, she nonetheless continued to use cocaine after his incarceration. Mother had a job and believed that she

16

could care for her children on her salary and benefits. Mother was working on the requirements for her children to be returned to her. However, Mother admitted to using cocaine when a friend offered it to her after the Department had taken her children, knowing that her parental rights were at risk for termination.

Mother argues that the need for permanence is the paramount consideration for a child's physical needs and emotional needs. Mother asserts that the evidence shows that the children were "still languishing in a non-adoptive foster home" and permanence had not been achieved. At the time of trial, the three youngest, L.E.F., R.E.F., and J.R.C, had been placed together in a foster home, and the Department was working on finding an adoptive family for them. While evidence about plans and adoptions are relevant to best interest, lack of evidence about definitive plans for permanent placement and cannot be the dispositive factor; otherwise determinations regarding best interest would regularly be subject to reversal on the sole ground that an adoptive family has yet to be located. *In re C.H.*, 89 S.W.3d at 28. "Instead, the inquiry is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of parent's rights would be in the child's best interest—even if the agency is unable to identify with precision the child's future home environment." *Id.* Therefore, the fact that the children were not in a permanent placement at the time of trial does not weigh against a finding that termination is in the best interest of the three youngest children.

We conclude that the trial court could have formed a firm belief or conviction that termination of Mother's rights to L.E.F., R.E.F., and J.C.R. was in the children's best interest. We overrule Mother's third issue.

### MANAGING AND POSSESSORY CONSERVATORS

In her fourth issue, Mother argues that the trial court abused its discretion by (1) appointing Milton managing conservator of the five older children and (2) failing to appoint Mother possessory conservator of those children.

17

Section 153.131 states:

(a) Subject to the prohibition in Section 153.004, unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child.

(b) It is a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child. A finding of a history of family violence involving the parents of a child removes the presumption under this subsection.

TEX. FAM. CODE ANN. § 153.131 (West 2008).

Section 153.191 states:

The court shall appoint as a possessory conservator a parent who is not appointed as a sole or joint managing conservator unless it finds that the appointment is not in the best interest of the child and that parental possession or access would endanger the physical or emotional welfare of the child.

TEX. FAM. CODE ANN. § 153.191 (West 2008).

The trial court's conservatorship determinations are subject to review only for abuse of discretion, and may be reversed only if the decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). Unlike termination findings, which must be supported by clear and convincing evidence, findings on conservator appointments must be supported by a preponderance of the evidence. *See id.* ("[A] finding that appointment of a parent as managing conservator would significantly impair the child's physical health or emotional development is governed by a preponderance-of-the-evidence standard.").

Under the abuse of discretion standard, legal and factual sufficiency of the evidence are not independent grounds of error, but rather are relevant factors in assessing whether the trial court abused its discretion. *In re T.J.L.*, 97 S.W.3d 257, 266 (Tex.

18

App.—Houston [14th Dist.] 2002, no pet.). There is no abuse of discretion as long as some evidence of a substantive and probative character exists to support the trial court's decision. *Id.*

In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the fact finding, crediting favorable evidence if reasonable persons could, and disregarding contrary evidence unless reasonable persons could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Vazquez v. Vazquez*, 292 S.W.3d 80, 83 (Tex. App.—Houston [14th Dist.] 2007, no pet.). When reviewing a factual sufficiency challenge, we consider all of the evidence and will set aside the finding only if the evidence is so weak or if the finding is so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998).

In determining conservatorship issues, the primary consideration of the trial court is the best interest of the child. *Ayala v. Ayala*, No. 01-09-00785-CV, — S.W.3d —, 2011 WL 2930311, at *7 (Tex. App.—Houston [1st Dist.] July 21, 2011, no pet.). The *Holley* factors for determining the best interest of the child are applicable to conservatorship decisions. *See id.* (applying *Holley* factors to trial court's decision on appointment of sole managing conservator).

Mother argues that the trial court abused its discretion by appointing Milton sole managing conservator because Milton had an extensive criminal record and history of assaultive behavior. The evidence reflects that Milton's criminal history includes a conviction for assault in 1999, and a conviction for assault of a family member in 2000. The evidence further shows that Milton was charged with criminal trespass in 1996, domestic assault in 2007, and patronizing prostitution in 2007. However, the evidence does not show that he was convicted on those charges.

19

Mother testified that Milton "beat her up all the time" and burned A.H.A.'s foot with a lighter because he tore the "working permit." Mother filed charges against Milton three times. A.H.A. told Mother that Milton makes him clean offices with him at night and he does not go to school because he is not sleeping at night. Mother testified that the children are begging at the church.

Curry testified that A.H.A. did not tell her that his father was forcing him to work at night with him or that the children are begging for money at church. A.H.A. told Curry that he is happy and he is okay; no one is yelling at or hitting him; and he is eating and taking baths. The trial court was entitled to reject Mother's testimony and believe Curry's testimony. *See Rich v. Olah*, 274 S.W.3d 878, 884 (Tex. App.—Dallas 2008, no pet.) (stating that, in a bench trial, the trial court is the sole judge of credibility of witnesses, assigns weight to be given their testimony, may accept or reject all or part of their testimony, and resolves any conflicts or inconsistencies in the testimony). After Milton came forward, he expressed an interest in the children. Curry testified that Milton had been driving down from Tennessee to see the children, and the children had bonded with him and were comfortable with him.

Because Milton was not the reason the children came into care, he was considered for managing conservator. As stated before, Milton had been driving down from Tennessee to see the children, and the children had bonded with him. The trial court had ordered the children to return to their father at a hearing held a week prior to trial and allowed the father to take the children to Tennessee. No finding of a history of family violence was made. Under these facts, we cannot say the trial court abused its discretion by appointing Milton sole managing conservator of A.H.A., M.O.A., D.J.A, E.A.A.A., and J.J.A.A.

Mother also argues that the trial court abused its discretion by refusing to appoint her possessory conservator. Curry testified that Mother had been regularly visiting the children throughout the case, the visits were "normal," and Mother brought the children

food.  Curry further testified that the children were bonded with Mother, and she adored her children.  Mother testified that the children called her everyday and told her that they wanted to come home.  Mother testified that she never used drugs in front of the children.  Mother claims that there is no evidence that she had any criminal or CPS history.

Contrary to Mother's claim that there is no evidence that she has any CPS history, the Department's report, which was admitted into evidence, showed that in March 2009 and October 2009, the Department had received allegations of neglectful supervision of the children, and reports that the children did not have enough food.  The issue of neglect arose again when the children told the Department that there were times that they did not have enough to eat, and Mother admitted that "rations tend to run very low towards the end of the month."  Moreover, Mother had consumed alcohol during all of her pregnancies; used cocaine during her last pregnancy resulting the stillbirth of the child; continued to use cocaine after Juan's incarceration, even though she claimed to use cocaine for strength in face of his abuse; used cocaine regularly on weekends; and used cocaine after the Department had taken her children, knowing her rights to her children were in jeopardy.  We conclude that the trial court did not abuse its discretion by failing to appoint Mother possessory conservator of A.H.A., M.O.A., D.J.A., E.A.A.A., and J.J.A.A..  We overrule Mother's fourth issue.

Having overruled all of Mother's issues, we affirm the trial court's judgment.


/s/      Sharon McCally
Justice


Panel consists of Chief Justice Hedges and Justices Jamison and McCally.