**In the Interest of S.M.L.**

**No. 14–04–01199–CV.**

Court of Appeals of Texas,
Houston (14th Dist.).

July 26, 2005.

Glenn H. Devlin and William B. Connolly, Houston, TX, for appellants.

Francisca Anna Aguirre–Saldana and Sandra D. Hachem, Houston, TX, for appellees.

Panel consists of Justices YATES and HUDSON, and Senior Justice MIRABAL.*

## OPINION

LESLIE BROCK YATES, Justice.

Appellant Charles W. Adams a/k/a Michael Elliott appeals from the trial court's order terminating his parental rights to his daughter, S.M.L. In four issues, he challenges the legal and factual sufficiency of the evidence underlying the findings in the termination order. We affirm the judgment of the trial court.

### FACTUAL AND LEGAL BACKGROUND

On August 29, 2003, appellee, the Texas Department of Family & Protective Services ("DFPS"), was notified that a mother was seen pushing her eighteen-month-old girl in a stroller against traffic on the feeder road of a busy highway. The baby, S.M.L., was drinking water from a dirty bottle, and her mother, Mei–Hwei Liu, had no milk or diapers for the baby and apparently did not understand that pushing a baby in a stroller on a feeder road might be dangerous.

DFPS initiated an investigation and went to S.M.L.'s home. The conditions there were unfit for a small child. The home was filthy, and a strong odor of feces and urine permeated the house. Feces were on the floor and smeared on the wall. The toilet was crusted with filth, and a mattress had fresh urine stains. Trash and dirty dishes were piled everywhere. The little food that was in the house was spoiled, and the child's high chair was covered in old food and stacked with cans of paint. Many items unsafe for a toddler to handle were within easy reach, including an empty whiskey bottle and fiberglass building materials. S.M.L. appeared malnourished and thin and was extremely dirty and smelly.

DFPS removed S.M.L. from the home. She was placed in foster care where she exhibited unusual behavior, including crying hysterically when being bathed and aggressively searching the trash can for food. The foster mother also reported that S.M.L. was extremely withdrawn and afraid of men; however, these behaviors have subsided over time. The foster mother testified that S.M.L. has bonded with her foster family and that they love her and want to adopt her.

During the investigation, DFPS discovered that Liu, the child's mother, is mentally ill. She has been diagnosed with mental problems, including bipolar disorder and paranoid schizophrenia, and has been on medication at various times, including when S.M.L. was born. In fact, DFPS had received a call about this family when the baby was born. Liu, who had given birth to S.M.L. at home before going to the hospital, said she did not know she was pregnant and thus had no prenatal care. Even after giving birth, Liu denied that she had a baby or that she could have had a baby. Liu did not respond to S.M.L.

---

when she was in the room, and Liu would not feed the baby, even when hospital staff directed her to do so. Appellant, who at that time was known as Michael Elliott,[1] was present at the hospital, and he denied knowing Liu was pregnant and gave conflicting information about his paternity. Appellant and Liu had made no arrangements for the baby, and so DFPS helped them obtain a crib, a car seat, baby formula, diapers, and clothing. The conditions at the home, though not as bad as when S.M.L. was later removed, were described as "deplorable." Thus, the home had to be cleaned and repaired before S.M.L. could be brought home, and under DFPS's direction, appellant was able to get the house "livable."

Appellant and Liu agreed to accept family services from DFPS, and DFPS allowed them to take S.M.L. home. DFPS visited a few more times and found everything generally acceptable, though Liu's sister visited at other times when DFPS was not present and found problems in the home. Liu's sister testified that the house was dirty, stacked with trash, and in need of repair. She did not think the house was fit for a young child. Liu's sister pointed these things out to appellant and even brought him a tool to help with the repairs, but appellant merely said "okay" and did nothing further. She also testified that appellant often appeared drunk during her visits and that he did not have any interaction with the baby.

In June 2002, appellant began telling DFPS that he did not know why they kept coming for visits because Liu had taken S.M.L. to Taiwan. Liu later told a therapist that appellant had sent her and the baby to Taiwan because he did not want to raise S.M.L. and wanted Liu's relatives to care for her. DFPS closed the case, although apparently Liu and S.M.L. returned from Taiwan shortly thereafter and resumed living with appellant.

Appellant was not present when DFPS removed S.M.L. and placed her in foster care. Liu told DFPS that appellant had left her two months prior to this incident and that she did not know where he was. Actually, appellant, who was known at this time as Charles W. Adams, had been incarcerated seventy-three days before for assaulting a police officer and was serving a two-year term. This was the second time appellant had been incarcerated for such an offense, having served time in the 1990s, also for assaulting a police officer. Appellant also admitted to having been arrested for trespass when S.M.L. was about two months old and to driving while intoxicated.

DFPS filed suit to terminate the parent-child relationship between S.M.L. and both her mother and father in September 2003. Appellant was not originally served because DFPS did not know appellant was in jail under a different name. However, appellant corresponded with Liu from jail, and he admitted he knew that S.M.L. was in DFPS custody by at least December 2003. Nevertheless, he did not make any effort to contact DFPS or to check on S.M.L. until about eight months later in August 2004, after he was officially served with the termination suit. DFPS sent appellant a family services plan, directing him to do various things such as take parenting classes. Appellant wrote the caseworker and questioned whether he should be required to do these things. At trial, appellant testified that he would complete the family services plan only if ordered to do so by the court.

---

1. According to his testimony at the termination hearing, appellant has gone by at least two names, possibly more, "Because it's my choice. It's a free world."

The termination hearing was held in October 2004. Both parents were present and represented by counsel, and each waived their right to a jury trial. After hearing their testimony as well as testimony from DFPS employees, Liu's sister, and the foster mother, the court ordered that both parents' parental rights be terminated. This appeal by the father only followed.

## STANDARD OF REVIEW

Parental rights can be terminated involuntarily only by a showing of clear and convincing evidence. TEX. FAM.CODE ANN. § 161.001 (Vernon 2002); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex.2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE ANN. § 101.007 (Vernon 2002); *In re J.F.C.*, 96 S.W.3d at 264.

When reviewing factual findings required to be made by clear and convincing evidence, we apply a standard of review that reflects this burden of proof. In evaluating the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.F.C.*, 96 S.W.3d at 266. In doing so, we assume the factfinder resolved disputed facts in favor of the finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* In a factual sufficiency review, we must also determine whether a factfinder could reasonably form a firm belief or conviction about the truth of the allegations. *Id.* If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not have reasonably formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

## ANALYSIS

In Texas, to terminate the parent-child relationship, the factfinder must find by clear and convincing evidence both that (1) the parent committed one or more acts specifically named in the Texas Family Code as grounds for termination and (2) termination is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001; *In re U.P.*, 105 S.W.3d 222, 229 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). The trial court found that termination was warranted under two separate statutory grounds and also found that termination would be in S.M.L.'s best interest. In his first two issues, appellant challenges the legal and factual sufficiency of the evidence of the statutory grounds for termination, and in his third and fourth issues, he challenges the legal and factual sufficiency of the evidence that termination is in S.M.L.'s best interest.

### *Statutory Grounds for Termination*

DFPS sought to terminate appellant's parental rights under subsections D and E [2] of section 161.001 of the Family Code,

2. In its petition, DFPS listed every possible ground for termination in section 161.001 of the Family Code. At the end of the termination hearing, the trial court asked DFPS which grounds it was moving under to terminate appellant's parental rights, and DFPS said subsections D and E. In the termination order, the trial court specified it was terminating based on subsections D and E. DFPS argues on appeal that we can affirm under subsection N, which allows for termination based on constructive abandonment of a child, because the record contains conclusive evidence to support that finding. Because we

which provide for termination if the trial court finds by clear and convincing evidence that the parent has

> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; [or]
>
> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.

TEX. FAM.CODE ANN. § 161.001(D), (E).

 While both subsections D and E focus on endangerment, they differ regarding the source and proof of endangerment. Subsection D concerns the child's living environment, rather than the conduct of the parent, though parental conduct is certainly relevant to the child's environment. *See In re J.T.G.,* 121 S.W.3d 117, 125 (Tex.App.-Fort Worth 2003, no pet.); *In re B.S.T.,* 977 S.W.2d 481, 484 (Tex.App.-Houston [14th Dist.] 1998, no pet.). Under subsection E, the cause of the endangerment must be the parent's conduct and must be the result of a conscious course of conduct rather than a single act or omission. *See In re J.T.G.,* 121 S.W.3d at 125; *In re B.S.T.,* 977 S.W.2d at 484. Endangerment can be exhibited by both actions and failures to act. *In re U.P.,* 105 S.W.3d at 233. It is not necessary that the parent's conduct be directed at the child or that the child actually be injured; rather, a child is endangered when the environment or the parent's course of conduct creates a potential for danger which the parent is aware of but disregards. *See In re U.P.,* 105 S.W.3d at 233; *In re N.R.,* 101 S.W.3d 771, 776 (Tex.App.-Texarkana 2003, no pet.).

conclude the evidence is legally and factually sufficient to support the trial court's judgment under subsections D and E, we need not de-

### Subsection D

 Appellant argues the evidence is legally and factually insufficient to terminate his parental rights under subsection D because, although he agrees that the child's living conditions were intolerable, he had been in jail for seventy-three days at the time she was removed and he had no knowledge of the conditions. Appellant claims that he always kept the house clean and that he had no idea Liu was mentally ill or that she would let the house so deteriorate.

 Appellant is correct that subsection D is not a basis for terminating parental rights if the parent was unaware of the endangering environment. *See In re T.H.,* 131 S.W.3d 598, 603 (Tex.App.-Texarkana 2004, pet. denied) ("[E]ven if clear and convincing evidence supported the trial court's finding that the environment posed a danger to T.H.'s well-being, the Department failed to show that [the father] knowingly placed or allowed T.H. to remain in such an environment."); *In re B.S.T.,* 977 S.W.2d at 485 (finding insufficient evidence to support termination under subsection D because there was no evidence that the father knew his children were in an endangering environment). However, a parent need not know for certain that the child is in an endangering environment; awareness of such a potential is sufficient. *See In re C.L.C.,* 119 S.W.3d 382, 392 (Tex.App.-Tyler 2003, no pet.) ("It is sufficient that the parent was aware of the potential for danger to the child in such environment and disregarded that risk."); *In re Tidwell,* 35 S.W.3d 115, 119–20 (Tex.App.-Texarkana 2000, no pet.) ("[I]t is not necessary for [the mother] to have had certain

cide whether we can properly consider subsection N as a ground for termination. *See In re U.P.,* 105 S.W.3d at 236.

knowledge that one of the [sexual molestation] offenses actually occurred; it is sufficient that she was aware of the potential for danger to the children and disregarded that risk by breaking her agreement with the court and placing and leaving the children in that environment.").

Appellant claims the home was always clean when he was there, but evidence in the record suggests otherwise. When S.M.L. was born, the home was "deplorable," and DFPS would not release S.M.L. to Liu and appellant until he cleaned and repaired the home. Liu's sister testified that the home environment again deteriorated in the weeks after S.M.L.'s birth, describing the home as unfit for a child. Liu's sister further testified that she told appellant the home needed to be cleaned and repaired and even brought him a tool to help, but he did nothing but say "okay."

Appellant denies any knowledge of Liu's mental illness, but again, evidence in the record shows the contrary. Liu's sister said that when appellant and Liu first got together, she told appellant he needed to take care of Liu because she was mentally ill, and appellant responded that he already knew that. Appellant also knew that Liu claimed not to have known that she was pregnant,[3] and even after S.M.L. was born, Liu denied that she gave birth,

did not respond to the baby's presence, and refused to feed her. This is consistent with a finding that appellant knew Liu had mental problems. Additionally, the trial court could have disbelieved appellant's testimony[4] that he was unaware of Liu's illness, given that she had been diagnosed with mental illness and had been taking medication, even at the time of S.M.L.'s birth.[5]

Further, the trial court was entitled to infer that appellant had at least some knowledge of S.M.L.'s physical and mental condition and her living environment based on the severity of the situation. When S.M.L. was placed in foster care, she was malnourished and underweight, aggressively searched for food in the trash can, cried hysterically when being bathed, and was extremely withdrawn and scared of men. Such behaviors and conditions take time to develop. Whether appellant actually neglected S.M.L. or merely observed it, the trial court could have reasonably inferred that appellant had knowledge of an endangering environment when he left the household for jail a short seventy-three days before.

■ Finally, while imprisonment alone is not a basis to terminate parental rights, it is an appropriate factor to consider. *See Tex. Dep't of Human Servs. v. Boyd*, 727

---

**3.** Appellant testified at the termination hearing that he suspected Liu was pregnant and believed Liu knew she was pregnant. If so, their failure to obtain prenatal care or make any preparations for S.M.L.'s arrival cast further doubt on Liu's mental status and both parents' ability to care for a baby.

**4.** The trial court obviously had concerns about appellant's truthfulness when, on the second day of the hearing, the trial court admonished appellant, saying "Any answer that you give in this court is under oath and you could be committing perjury if you gave a false answer under oath." Appellant said he understood that but added, "I haven't been

sworn in." Appellant's attorney reminded him that his oath from the previous day still applied, and appellant responded, "I wasn't aware of that."

**5.** Appellant completely disregards this evidence regarding the earlier living conditions and Liu's behavior, arguing that a DFPS worker eventually noted that the house was "clean" and that she had no concerns about Liu's ability to care for S.M.L. However, the issue here is not DFPS's knowledge but rather appellant's knowledge of the child's living environment and Liu's parenting abilities, and this evidence bears on appellant's knowledge.

S.W.2d 531, 533–34 (Tex.1987). When parents are incarcerated, they are absent from the child's daily life and are unable to provide support, and when parents like appellant repeatedly commit criminal acts that subject them to the possibility of incarceration, that can negatively impact a child's living environment and emotional well-being. *See In re C.L.C.,* 119 S.W.3d at 393; *In re S.D.,* 980 S.W.2d 758, 763 (Tex.App.-San Antonio 1998, pet. denied).

After reviewing the evidence in the light most favorable to the findings and disregarding all evidence a reasonable factfinder could have disbelieved and also reviewing the disputed evidence in light of the entire record, we conclude that a reasonable factfinder could have formed a firm belief or conviction that appellant knowingly allowed S.M.L. to remain in conditions or surroundings that endangered her physical or emotional well-being. He went to jail and did nothing to prevent S.M.L. from remaining alone in an unfit home environment with a mentally unstable mother who was unable to care for her, thus supporting termination under subsection D.

### Subsection E

■ Appellant also contends the evidence is legally and factually insufficient that he engaged in a course of conduct that endangered S.M.L. under subsection E. His primary argument is that incarceration alone cannot support termination and that his crimes leading to incarceration are irrelevant because they were not domestic violence or witnessed by S.M.L. We disagree.

Incarceration alone will not support termination, but it is an appropriate factor to consider in evaluating a parent's course of conduct endangering the child. *See Boyd,* 727 S.W.2d at 533; *In re U.P.,* 105 S.W.3d at 233–34. Appellant has been incarcerat-ed for assaulting a police officer on two separate occasions, once before and once after S.M.L.'s birth. *See In re U.P.,* 105 S.W.3d at 234 ("Endangerment may include what a parent does both before and after birth of a child."). Such a propensity for violence is evidence of endangerment, particularly when considered in light of S.M.L.'s fear of men and appellant's angry outbursts during the termination hearing, including calling S.M.L.'s attorney ad litem a "b——" [expletive]. *In re J.I.T.P.,* 99 S.W.3d 841, 845 (Tex.App.-Houston [14th Dist.] 2003, no pet.) ("Domestic violence, want of self control, and propensity for violence may be considered as evidence of endangerment."). Appellant's most recent assault on a police officer is particularly significant because he committed the crime knowing that, as before, it would result in his incarceration, thus leaving his young daughter without his support and in the care of a mentally ill mother with questionable parenting abilities. *See In re C.L.C.,* 119 S.W.3d at 398 (finding sufficient evidence to support termination under subsection E, based in part on father leaving children in the care of a mentally ill mother who was a danger to the children); *see also In re G.V.,* No. 14–02–00604–CV, 2003 WL 21230176, at *4 (Tex.App.-Houston [14th Dist.] May 29, 2003, pet. denied) (mem.op.) (noting that father's imprisonment for killing a police officer was one of many "actions and circumstances [that] directly impact [the child]'s physical and emotional well-being").

In addition to appellant's violent, criminal behavior and incarceration, appellant's lack of demonstrated concern for his daughter's well-being is further evidence of endangerment. Appellant failed to maintain contact with S.M.L. during his incarceration, and even after learning she was in DFPS custody, did not contact DFPS for eight months. This is consistent

with Liu's sister's testimony that appellant showed no interest in the child and with testimony that he wanted S.M.L. to live in Taiwan so that Liu's parents could take care of her. Appellant also failed to notify DFPS of his location or name change after he was aware DFPS had taken custody of S.M.L., stating, "I didn't know that you needed to locate me." Such a lack of concern and shirking of parental responsibilities supports termination under subsection E. *See In re M.J.M.L.*, 31 S.W.3d 347, 352 (Tex.App.-San Antonio 2000, pet. denied) (considering as evidence of endangerment father's leaving drug-using mother while she was pregnant and subsequent lack of cooperation with the agency, including refusing to provide his address).

After reviewing the evidence, we conclude that a reasonable factfinder could have formed a firm belief or conviction that appellant engaged in a course of conduct that endangered S.M.L.'s physical or emotional well-being, thus supporting termination under subsection E.

We overrule appellant's first and second issues.

### Best Interest of the Child

In his third and fourth issues, appellant challenges the legal and factual sufficiency of the evidence that termination is in S.M.L.'s best interest. There is a strong presumption that the best interest of the child is served by keeping the child with its natural parent, and the burden is on DFPS to rebut that presumption. *In re U.P.*, 105 S.W.3d at 230. The Texas Supreme Court has examined several factors in evaluating the child's best interest, including (1) the desires of the child, (2) the present and future physical and emotional needs of the child, (3) the present and future emotional and physical danger to the child, (4) the parental abilities of the person seeking custody, (5) the programs available to assist those persons seeking custody in promoting the best interest of the child, (6) plans for the child by the individuals or agency seeking custody, (7) the stability of the home or proposed placement, (8) acts or omissions of the parent that indicate the existing parent-child relationship is not appropriate, and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex.1976); *In re U.P.*, 105 S.W.3d at 230. This list is not exhaustive, nor is evidence required on all nine factors to support a finding terminating a parent's rights. *Holley*, 544 S.W.2d at 372; *In re U.P.*, 105 S.W.3d at 230.

With these factors in mind, we review the evidence regarding S.M.L.'s best interest. S.M.L. is a toddler and unable to express her desires, but she has bonded with her foster parents, calls them "mamma" and "daddy," and knows their children as her brothers. *See In re U.P.*, 105 S.W.3d at 230. They can provide a stable home, love her, and want to adopt her. *See In re G.V.*, 2003 WL 21230176, at *5. There is no evidence that S.M.L. is bonded with appellant. At the time of the termination hearing, appellant was incarcerated and had a pattern of criminal and violent conduct, which makes it likely that appellant will face incarceration again in the future. *See id.; In re U.P.*, 105 S.W.3d at 231. Appellant has shown little interest in S.M.L.'s life. He was often drunk and unengaged during S.M.L.'s first few months, and then sent the child and her mother to Taiwan so that Liu's family could care for her. He did nothing to maintain any relationship with S.M.L. during his incarceration and did not even contact DFPS for eight months after learning DFPS had removed her from the home. Appellant had no definite plans for caring for S.M.L. upon his release. He planned to work "if I absolutely have to" and to return to living with Liu, who is obviously unfit to care for S.M.L. and who has indi-

cated that she does not want to live with appellant. *See In re G.V.*, 2003 WL 21230176, at *5; *In re J.I.T.P.*, 99 S.W.3d at 847; *In re A.N.*, No. 14–02–00157–CV, 2002 WL 31250731, at *3 (Tex.App.-Houston [14th Dist.] Oct. 3, 2002, no pet.) (not designated for publication). Appellant has taken no responsibility for S.M.L.'s living conditions or physical and emotional state at the time she was removed, and he refused to even inquire about taking parenting classes available in jail. In fact, appellant testified that he would not complete any portion of DFPS's family services plan unless it was court ordered. *See In re J.I.T.P.*, 99 S.W.3d at 847.

After reviewing this evidence, we conclude that the trial court's determination that terminating appellant's parental rights is in S.M.L.'s best interest is supported by clear and convincing evidence that is legally and factually sufficient. We overrule appellant's third and fourth issues.

Having overruled all of appellant's issues, we affirm the trial court's judgment.