**Affirmed and Memorandum Opinion filed August 27, 2013.**



In The

# Fourteenth Court of Appeals

### NO. 14-13-00230-CV

## IN THE INTEREST OF D.M.K, C.A.K, J.J.K., AND J.A.K., CHILDREN.

**On Appeal from the County Court at Law**
**Washington County, Texas**
**Trial Court Cause No. CCL6454**

## M E M O R A N D U M   O P I N I O N

Following a bench trial, the trial court signed a judgment terminating I.W.'s parental rights with respect to four minor children: D.M.K., C.A.K., J.J.K., and J.A.K.[1] The trial court also named the Texas Department of Family and Protective Services (the Department) as permanent managing conservator of all four children.

---

[1] To protect the identity of the minor children, we use aliases when referring to the adoptive parents and the children involved in this appeal. *See* Tex. Fam. Code Ann. § 109.002(d) (West Supp. 2012); Tex. R. App. P. 9.8.

I.W. now appeals from that judgment.[2]  In his first issue, I.W. contends the Department did not present legally sufficient evidence to support the trial court's finding that I.W. violated subsections D and E of section 161.001(1) of the Texas Family Code.  *See* Tex. Fam. Code Ann. §§ 161.001(1)(D), (E) (West Supp. 2012). In his second issue, I.W. contends the Department did not present legally sufficient evidence to support the trial court's appointment of the Department as the permanent managing conservator of the children.  Concluding the evidence is legally sufficient to support both findings, we overrule I.W.'s issues and affirm the trial court's judgment.

## BACKGROUND

I.W. and D.K. are married.  K.M. is D.K.'s daughter, I.W.'s stepdaughter, and the biological mother of the four children.  I.W. and D.K. adopted the four children after K.M.'s parental rights were terminated as a result of her physical abuse of D.M.K. and C.A.K.  Below, we summarize the trial testimony relevant to the trial court's termination findings, particularly its finding that I.W. violated section 161.001(1)(D) by knowingly placing and allowing the children to remain in conditions or surroundings which endangered their physical or emotional well-being.

## I.    Testimony by Department investigator Aleda Jarvis

About two years after I.W. and D.K. adopted the children, the Department received a report that the children were being physically abused.  Aleda Jarvis and

---

[2] This is not the first time this matter has been before this Court.  I.W.'s and D.K.'s parental rights were terminated following a jury trial in 2011.  We reversed the portion of that judgment terminating I.W.'s parental rights because the trial court did not appoint an attorney to represent I.W. in that first proceeding, and we remanded for a new trial as to I.W.  *See In re D.M.K., C.A.A.K., J.J.K., and J.A.K.*, No. 14-11-01046-CV, 2012 WL 2109262 (Tex. App.— Houston [14th Dist.] June 11, 2012, no pet.) (mem. op.).  This appeal is from the judgment of termination in the second trial.

Shewarren Williams investigated the report.[3]

After reviewing the children's prior history with the Department, Jarvis and Williams interviewed the three oldest children at their elementary school. They initially talked to D.M.K., who was eight at the time of the interview.

According to Jarvis, D.M.K. appeared to be a healthy weight and was clean, though she appeared "a bit disheveled." When D.M.K. was asked how she was treated at home, D.M.K. reported that D.K. made her stand in hot rice and hit her with a belt, an extension cord, and a clothes hanger. D.M.K. also reported that K.M., her biological mother, was regularly in the home and "played a role in hitting her on a daily basis." According to D.M.K., K.M. lived in the home and was a caregiver for the children. Jarvis also testified that a physical examination revealed dots or marks on D.M.K.'s feet that were consistent with her description of events in the home.

Jarvis further testified that she did not recall if D.M.K. mentioned whether I.W. was around, but D.M.K. did report that there was no one providing protection for her. In addition, D.M.K. also told the investigators that she feared returning to D.K.'s home. According to D.M.K., she was afraid that if she returned to the home, D.K. would follow through with her threats to harm D.M.K.'s teachers for reporting the situation to the Department.

The investigators next talked to C.A.K. C.A.K. reported abuse similar to that experienced by D.M.K. The investigators discovered marks on C.A.K.'s back, stomach, and side. Jarvis could not recall if C.A.K. indicated how she got the injuries that resulted in those marks.

Finally, the investigators spoke with J.J.K. Although the investigators

---

[3] Williams, the primary investigator, is no longer employed by the Department.

emphasized the importance of being honest, J.J.K. specifically told Jarvis he was not going to tell the truth and he did not disclose whether or not he was being harmed in D.K. and I.W.'s home.

Jarvis and Williams then went to D.K. and I.W.'s home, where they discovered K.M. alone with J.A.K., the youngest of the four children. K.M. was very belligerent and refused to answer most of the investigators' questions. Once D.K. arrived at the home, she denied making the children stand in hot rice. She also denied hitting the children with a belt, an extension cord, or a clothes hanger. I.W. was not present in the home during this visit by the investigators.

D.K. agreed to a temporary voluntary placement of the children with relatives. In addition, the matter was transferred to the Family Based Safety Services (FBSS) section of the Department. FBSS works with parents to improve their parenting skills so their children can be returned to them. Jarvis testified that she had no further involvement in the matter after the transfer to FBSS.

## II. Testimony by D.M.K.

D.M.K. began her testimony by describing the physical abuse she received at the hands of K.M. The abuse included a beating with a belt during which the buckle struck one of D.M.K.'s eyes, causing a serious injury. D.M.K. also testified that K.M. did not have a doctor examine the injury. The injured eye eventually had to be removed. The abuse also included burning D.M.K. with an iron, "whooping" her hard enough to leave marks, and placing her on an ant mound that resulted in bites severe enough to leave permanent marks.

D.M.K.'s testimony then turned to her life since she was adopted by D.K. and I.W. D.M.K. testified that her life had not improved since the adoption. She testified that she did not get fed regularly, she had to cook for herself and her

4

siblings, they did not bathe or brush their teeth regularly, and she would go to school dirty. According to D.M.K., her lack of bathing caused her problems at school. According to D.M.K., they frequently moved, had no water or electricity, and little food.

D.M.K. also testified that I.W. and D.K. knew K.M. was not supposed to come around their home while the children were living with them, but they allowed her to do so. In fact, D.M.K. testified that I.W. and D.K. regularly allowed K.M. to take care of the children without either of the adoptive parents being present. D.M.K. also testified that D.K. would frequently take the subsidy money meant to pay the living expenses of the children and spend it at the bingo hall.[4]

D.M.K. next testified that I.W. hurt the children. D.M.K. testified that I.W. would occasionally leave the children home alone. She also testified that I.W. hit her and a cousin in the head with the television remote when they tried to increase the television volume. D.M.K. further testified that I.W. would punish her by sending her to her room and by hitting her with a belt. D.M.K. denied that I.W. hit her for taking food. D.M.K. also denied that I.W. ever made her stand in hot rice, but went on to testify that I.W. was present when D.K. made her stand in hot rice and did nothing to stop D.K.

D.M.K. testified that she learned to fight and steal from D.K. In fact, D.K. and I.W. encouraged D.M.K. to fight the children who made fun of her injured eye and when she did not, they physically punished her. D.M.K. also testified that in addition to making the children stand in hot rice, D.K. punished the children by tying them to a tree, locking them out of the house, and locking them in a closet.

---

[4] Evidence introduced during the trial indicates that D.K. and I.W. received subsidies of approximately $51,000 while the children were in their care.

In addition, D.M.K. testified that D.K. frequently made fun of her injured eye. D.M.K. also testified that while I.W. never called her names, he never stopped D.K. from physically punishing the children or calling D.M.K. names. D.M.K. explained that I.W. did not stop D.K. because he was afraid of her. D.M.K. explained that she knew I.W. was afraid of D.K. because she had seen D.K. threaten him with a knife.

D.M.K.'s testimony also addressed the children's school attendance while living with D.K. and I.W. According to D.M.K., the school-aged children missed a lot of school and were frequently tardy as well. D.M.K. explained they sometimes missed school because they were sick, but other times they missed simply because they did not want to go. D.M.K. continued that when the children decided they did not want to go to school, D.K. and I.W. did not make them go. D.M.K. admitted the frequent absences and late arrivals caused her trouble in school.

Finally, D.M.K. testified that she did not want to live with I.W. and did not want to ever have to see D.K. or I.W. again.

### III. Testimony by S.D., the children's aunt and current caregiver

S.D. is the children's aunt. S.D. and her husband have been taking care of the children since the Department removed them from D.K. and I.W.'s home, approximately three years. While initially the plan was for S.D. to keep the children temporarily, that has changed since D.K.'s parental rights were terminated. Now, S.D. testified she considers the children to be part of her family and her long-term plan for them is to make certain they finish high school and find careers.

S.D. testified that when she received the children, they had numerous problems. They included trouble sleeping at night, stealing food, hyperactivity,

poor hygiene, and issues at school. The school issues included poor behavior and grades. According to S.D., all of those situations have improved since the children came to live in her home.

S.D. also testified about D.M.K.'s injured eye. According to S.D., D.M.K. had low self-esteem as a result of her injured eye because other children would make fun of her and she would get into arguments and confrontations with them as a result. S.D. was eventually able to take D.M.K. to see a specialist who recommended that the eye be removed. The situation has improved since D.M.K.'s eye was removed and she received an artificial replacement.

S.D.'s testimony also addressed D.K.'s and I.W.'s visits to see the children after they came to live with S.D. According to S.D., D.K.'s visits had to be moved to the Department because of her behavior during the visits. S.D. testified that I.W. has visited the children two times, both times staying in his car throughout the visit.

## IV. Testimony by school principal Kimberly Rocka

Kimberly Rocka was the principal at the children's elementary school while they were living with D.K. and I.W., and also after they moved to S.D.'s home. Rocka testified regarding each of the school-aged children.

### A. D.M.K.

According to Rocka, D.M.K. had numerous problems during the period she lived with D.K. and I.W. These included absences and frequently being late to school, as well as academic and behavior issues. Rocka also testified that D.M.K. had constant referrals to her office as a result of her aggression toward other children and her inability to get along with her teacher. Rocka testified that D.K. was not responsive to Rocka's efforts to address the problems and she never saw

I.W. at the school.

Rocka noticed injuries on D.M.K., including scars on her hands and blisters on her feet. D.M.K. told Rocka that the scars were the result of ant bites and the blisters were the result of D.K. making her stand in a pot of hot water and rice as punishment. D.M.K. also told Rocka that she was spanked with a belt as punishment. Rocka and D.M.K. also discussed her injured eye. According to D.M.K., the initial injury was caused by K.M. hitting her eye with a belt buckle, and it was injured a second time when D.K. hit the eye.

Rocka testified that she saw D.M.K. almost every day. She testified that D.M.K. came to school wearing dirty and inappropriate clothing, she smelled, and she behaved like an animal let out of a cage. Rocka also testified that D.M.K.'s appearance and lack of hygiene caused her problems with other students, who would tease her. Rocka testified that D.M.K. would physically lash out at the other students in response to the teasing. According to Rocka, D.M.K.'s issues began to improve once she went to live with S.D.

### B.   C.A.K.

Rocka also interacted with C.A.K. According to Rocka, C.A.K. told her she experienced the same punishments as D.M.K. Rocka also testified that C.A.K. had poor attendance at school and exhibited many of the same behaviors at school as D.M.K. C.A.K. also suffered from poor personal hygiene. Rocka testified that the three school-aged children were always hungry. Rocka also testified she had the same lack of success at getting D.K. to meet with school officials to address C.A.K.'s problems. Finally, according to Rocka, C.A.K.'s issues also improved once she went to live with S.D.

8

### C.   J.J.K.

Rocka also saw J.J.K., who was in kindergarten, because of his poor behavior and absences.  Rocka testified that J.J.K. missed so many days of school that he had to repeat kindergarten.  J.J.K. also had poor hygiene and experienced issues resulting from not receiving his ADHD medication.   Once again, Rocka testified that she saw improvement in J.J.K.'s issues once he went to live with S.D.

## V.   Testimony by school diagnostician Kelli Fontenot

Fontenot was the educational diagnostician at the children's elementary school.  Fontenot's job duties included conducting meetings to address special needs children as well as performing special education testing for those children experiencing academic problems.  Fontenot testified that she worked closely with D.M.K.

D.M.K. told Fontenot that her mother, K.M., was living with the children in D.K. and I.W.'s home.  D.M.K. said she was not supposed to tell Fontenot about K.M. living with them because K.M. was not supposed to be living with them. Later, D.M.K. told Fontenot that D.K. was angry that she had told Fontenot about K.M. living with the children, and D.K. made D.M.K. stand in hot rice for a long time.

D.K. also told D.M.K. that she could not talk to Fontenot because she worked for the Department.  D.K. told D.M.K. that the Department was going to take the children away and they were going to be raped and beaten once they went into foster homes.  D.M.K. also told Fontenot about D.K.'s threats to kill her if she talked to anyone at school.  D.M.K. told Fontenot she had been beaten by D.K., by K.M., and also by I.W., who once beat her with a belt when she ate his chips. According to Fontenot, after telling her about these incidents, D.M.K. was

9

hysterical with fear and did not want to leave the school or return home. Fontenot testified that D.M.K. indicated there was no one in her home providing protection for her.

Fontenot also testified about her efforts to meet with D.K. to coordinate more testing for D.M.K. D.K. continually missed the scheduled meetings or delegated one of her daughters to attend in her place. Throughout Fontenot's efforts to coordinate testing of D.M.K., she never saw or met I.W.

Finally, Fontentot testified that she observed the same academic, hygiene, and behavior problems in the children that Rocka reported. She also testified that she noticed improvement in all three areas once the children left D.K. and I.W.'s home and started living with S.D.

## VI.    Testimony by Department safety caseworker Brandon Coronado

Coronado is an FBSS caseworker for the Department. According to Coronado, FBSS handles cases after the investigation department discovers concerns with a family. FBSS then takes over and tries to work with the family to prevent removal of the children from their home.

Coronado worked with D.K., I.W., and the children for about three months in 2010. He referred them to Cheryl Mikeska for family and individual counseling. Coronado primarily interacted with D.K. during his work with the family. Coronado testified that he only met I.W. approximately three times and those meetings normally occurred when he visited I.W.'s home to monitor the grandparents' progress on the family plan. Coronado's visits occurred after the children had been removed from the home. According to Coronado, I.W. never started the therapy during Coronado's involvement with the case. Coronado testified that, other than I.W.'s lack of progress on the family plan, there was

nothing specific that he recalled that caused him concern about I.W. during these home visits.

Coronado testified that he asked the court to appoint the Department as temporary managing conservator of the children because he believed it was necessary to provide them protection. Coronado also testified that he did discuss with D.K. and I.W. the fact that K.M. was not allowed around the children without supervision. Coronado testified that both understood this was something that was not supposed to have occurred in the past.

## VII. Testimony by counselor Cheryl Mikeska

Mikeska is a licensed professional counselor who, at the time of the trial, had been working with the children for about three years. Mikeska's first session following the referral was an intake session. The four children and D.K. were present for this session, but I.W. was not. Mikeska testified the session did not go well as it "seemed more harmful to the children than helpful." As a result, Mikeska changed the therapy to just individual therapy for the children to prepare them for family therapy sessions. According to Mikeska, the individual therapy sessions occurred over two to three months. During the individual therapy sessions, the children consistently reported that they had been harmed in D.K. and I.W.'s home and there was no one to provide protection for them.

A family therapy session was eventually scheduled and the children, D.K., and I.W. all attended. Mikeska testified that this "was a disastrous session" because "allegations were disowned, not acknowledged, and denied." "[T]he children [became] very emotional, very sad, very angry, very disillusioned, and confused, and [they] could not understand why it was made to seem as if they had

11

lied." Both D.K. and I.W. denied all of the allegations of abuse.[5] Mikeska testified she immediately stopped all family therapy sessions thereafter.

## VIII.  Testimony by Department supervisor Melissa Brod

Brod is a supervisor for the Department who oversees the case workers dealing with children in foster care. Brod testified that the decision was made to terminate I.W.'s parental rights because he had not made significant progress in his services which would allow the children to be returned safely to him. Brod testified the determination was made that the best long-term option for the children was to terminate D.K.'s and I.W.'s parental rights and then allow S.D. and her husband to adopt them.

According to Brod, she understood that D.K. and I.W. had been told that K.M. should not have unsupervised time with the children. The reason for that restriction was the physical abuse K.M. had inflicted on the children. Despite that warning, D.K. and I.W. had allowed K.M. to have regular contact with the children. In addition, Brod testified that neither D.K. nor I.W. had taken any responsibility for the physical abuse in their home; in fact, they continuously denied there was any abuse and instead asserted the children's allegations were not true. Finally, Brod testified that D.K.'s and I.W.'s parenting skills and home environment have not improved.

## IX.  Testimony by children's advocate Shirley Anderson

Anderson is the Court-Appointed Special Advocate handling the children's case. According to Anderson, while living with I.W., the children missed a lot of school and did not have appropriate clothing. The children also discussed being physically harmed by D.K. In addition, the children told Anderson that K.M. lived

---

[5] During this session, D.K. did admit to placing the children in a closet. She asserted it was done as part of a Halloween game, however.

with them in D.K. and I.W.'s home. Finally, when discussing I.W., the children said his role in their education was to make sure they were up and got breakfast, to take them to catch the school bus in the morning, and to pick them up in the afternoon.

## XI. I.W.'s testimony

I.W. was initially asked some basic questions about the children. After initially denying that he had adopted the four children along with his wife, I.W. admitted that he had. While I.W. could identify the four children by name, he did not know any of their birthdays, was unsure how old the two youngest children were at the time of trial, and was also unsure of each child's grade level in school. In addition, I.W. could not recall the last time he had visited the children at S.D.'s home. I.W. then testified that he visited the children frequently, about three times a week. I.W. later testified that he had not visited the children for a long time, however, because he believed the Department prevented him from visiting them.

I.W. testified that the children were placed for adoption when their biological mother, K.M., neglected them. He denied having any knowledge of how K.M. neglected the children. I.W. admitted that he had never asked anyone why the children had been removed from K.M. and placed in his home. I.W. also testified that he did not know if K.M. had ever harmed the children because he had never seen her hurt them. I.W. went on testify that he did not think K.M. had caused any harm to the children. I.W. denied having any knowledge of how D.M.K.'s eye injury happened. While I.W. did testify that he would protect the children from K.M., he also testified that if he was not present in the home and K.M. was, he could not protect the children from her.

I.W. did acknowledge that he was aware that K.M.'s parental rights had been terminated. I.W. also testified that he had told K.M. that she could not have

unsupervised access to the children. I.W. went on to testify that he had never let K.M. take care of the children. While admitting that K.M. did visit his home, he did not remember her ever being alone with the children.

I.W. acknowledged that once the children were placed in his home, he and D.K. were responsible for making sure no one hurt them. In fact, I.W. testified that he did not have a problem with the care the children received while living in his house. Then, when asked about the first trial where a jury had determined that D.K. had hurt the children, I.W. denied that D.K. had done anything to harm the children and then asserted that the evidence against her was all lies and not true.

I.W. testified that if the trial court determined the children should be returned to his care, they would go back to his home. I.W. admitted that D.K. would be living in the home as well and would continue having a role in taking care of the children. I.W. then testified that D.K would be the primary person taking care of the three girls. I.W. also testified that he did not have any problem with the way D.K. took care of the children and once again denied that D.K. had ever harmed the children and believed the evidence that she had, was all lies.

I.W. admitted that he did spank the children, but denied he ever left a mark on them. He also denied that D.K. disciplined the children in such a way that it left marks on the children. I.W. admitted that he was present in the home, but denied D.K. punished the children by making them stand in hot rice. I.W. also denied ever seeing the children (1) being beaten with extension cords or hangers, (2) being tied to a tree, (3) being locked out of the house or in a closet, or (4) having injuries. I.W. denied that the children were harmed in his household and believed the children had been coached to say they had. I.W. testified that he believed the therapist, the school officials, the Department personnel, and everybody connected to the case had lied about D.K.'s treatment of the children.

14

I.W. testified that he was responsible for getting the children to school and picking them up after school. As far as the children's attendance at school, I.W. testified they only missed a few days. Turning to the personal hygiene of the children, I.W. testified that D.K. did a good job keeping the children clean. He asserted that the school officials lied about the children's poor personal hygiene. He also testified that J.J.K. was given his ADHD medicine and he was not aware of any complaints from the school that he was not. I.W. was also not aware that J.J.K. had been required to repeat kindergarten. I.W. testified that he could not remember any problems at the children's school but then admitted that they did have behavioral problems, including the fact that J.J.K. had been banned from riding the bus as a result of his fighting. I.W. went on to testify that he believed all of the school's complaints about the children were false.

I.W. testified that he had no concerns about D.K. being around the children if they were returned to him. Finally, when asked if he would do anything differently in the way he cared for the children, I.W. testified that "they'd be taken care of like we did the first time. We didn't do nothing wrong."

## XII. The trial court signs a judgment terminating I.W.'s parental rights

At the conclusion of the evidence, the trial court found that (1) I.W. knowingly allowed the children to remain in conditions and surroundings which endangered the physical and emotional well being of the children; (2) I.W. knowingly placed the children with persons engaged in conduct which endangered the physical and emotional well being of the children; and (3) termination of I.W.'s parental rights was in the best interest of the children and entered judgment accordingly. This appeal followed.

ANALYSIS

I.W. brings two issues on appeal. In his first issue, I.W. contends that the trial court's judgment involuntarily terminating his parental rights should be reversed and rendered because the Department did not present legally sufficient evidence that he violated either subsection D or subsection E of section 161.001(1) of the Texas Family Code. In his second issue, I.W. contends the trial court erred when it appointed the Department the children's permanent managing conservator because the evidence is legally insufficient that returning the children to I.W. would significantly impair the children's physical health or emotional development. We address each issue in turn.

## I. The evidence is legally sufficient that I.W. violated section 161.001(1)(D) of the Texas Family Code.

### A. The standard of review

Parental rights can be terminated involuntarily only by a showing of clear and convincing evidence. Tex. Fam. Code Ann. § 161.001 (West 2008); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008); *In re J.F.C.*, 96 S.W.3d at 264.

When reviewing factual findings required to be made by clear and convincing evidence, we apply a standard of review that reflects this burden of proof. In reviewing the legal sufficiency of the evidence in a parental termination case, we must consider all of the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009); *In re J.F.C.*, 96 S.W.3d at 266. We assume that the fact finder resolved

16

disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266. Under this standard, we may not second-guess the fact finder's resolution of a factual dispute by relying on evidence that is disputed, or that the fact finder could have rejected as not credible. *In re L.M.I. and J.A.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

### B.      The statutory grounds for termination found by the trial court

In Texas, parental rights can be terminated only upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by section 161.001(1) of the Texas Family Code; and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(1) (West 2008); *In re E.N.C., J.A.C., S.A.L., N.A.G., and C.G.L.*, 384 S.W.3d 796, 803 (Tex. 2012). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

The trial court found that I.W. violated subsections D and E of section 161.001(1) of the Texas Family Code. They provide that a trial court may terminate the parent-child relationship if it determines by clear and convincing evidence that the parent has:

> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; [or]
>
> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.

Tex. Fam. Code Ann. § 161.001(1)(D), (E). Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is

17

also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Because I.W. does not challenge the trial court's best interest finding, we must uphold the termination if the evidence is sufficient to support either of the predicate grounds found by the trial court. *In re E.A.G., Y.M.G., C.G.C., V.G.G., S.G., and D.A.G.*, 373 S.W.3d 129, 141 (Tex. App.—San Antonio 2012, pet. denied).

### C. Clear and convincing evidence establishes that I.W. knowingly violated section 161.001(1)(D) of the Texas Family Code.

While both subsections D and E focus on endangerment, they differ regarding the source and proof of endangerment. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Subsection E focuses on the conduct of the parent, and subsection D concerns the child's living environment. *Id.* When termination of parental rights is based on subsection D, the endangerment analysis focuses on the evidence of the child's physical environment, although the environment produced by the conduct of the parents bears on the determination of whether the child's surroundings threaten his well-being. *Id.* Under subsection D, the reviewing court examines the evidence related to the environment of the children to determine whether the environment was the source of endangerment to the children's physical or emotional well-being. *In re K.A.S., J.G.S., and W.S., II*, 131 S.W.3d 215, 222 (Tex. App.—Fort Worth 2004, pet. denied).

Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home is part of the conditions or surroundings of the child's home under subsection D. *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Therefore, subsection D permits termination if the

petitioner proves parental conduct caused a child to be placed or remain in an endangering environment. *Id.* Endangerment can be exhibited by both actions and failures to act. *In re S.M.L.*, 171 S.W.3d at 477. In addition, it is not necessary that a parent's conduct be directed at the child or that the child actually be injured; rather, a child is endangered when the environment creates a potential for danger which the parent is aware of, but disregards. *Id.* Evidence is legally sufficient to support a finding of endangerment if there is some evidence on which a reasonable fact finder could have formed a firm belief or conviction of endangerment. *In re E.N.C.*, 384 S.W.3d at 803. Subsection D permits termination based on a single act or omission. *In re Z.C.J.L.*, No. 14-13-00115-CV, 14-13-00147-CV, 2013 WL 3477569, at *12 (Tex. App.—Houston [14th Dist.] July 9, 2013, no pet.) (mem. op.).

In his challenge to the legal sufficiency of the evidence, I.W. emphasizes his trial testimony in which he denied having knowledge of the abusive conduct taking place in his home. According to I.W., this denial renders the evidence legally insufficient to support the trial court's finding that he violated section 161.001(1)(D). While it is true that subsection D cannot provide the basis for terminating parental rights if the parent was unaware of the endangering environment, I.W. ignores other evidence in the record demonstrating his awareness of the physical abuse taking place in his home.

This evidence includes I.W.'s own testimony that he was regularly present in the home where the physical abuse occurred. It also includes D.M.K.'s testimony that I.W. was present when D.K. made her stand in hot rice and did nothing to stop her, and that I.W. did not stop D.K. from physically abusing the children because he was afraid of her. I.W. also ignores Aleda Jarvis's and Kelli Fontenot's testimony that D.M.K. told each of them that both D.K. and K.M. were living in

19

the home, both were physically abusing her, and no one living in the home provided any protection.

Because the trial court, as the trier of fact, could have (1) reasonably disregarded as not credible I.W.'s testimony that no abuse occurred and he was not aware of it if it had, (2) reasonably believed the multiple witnesses who testified that the children were regularly abused in the home, including at least once in I.W.'s presence, (3) reasonably inferred that I.W. was aware of other instances of abuse because of his regular presence in the home, and (4) reasonably believed that I.W. failed to act to stop the abuse for reasons other than lack of awareness, we hold there is clear and convincing evidence supporting the trial court's finding that I.W. knowingly violated section 161.001(1)(D) of the Texas Family Code with regard to all four children. *See In re Z.C.J.L.*, 2013 WL 3477569, at \*13 (holding evidence of endangerment was legally sufficient because the jury was entitled to resolve conflicts in the evidence regarding the father's knowledge of the endangerment); *In re E.A.G.*, 373 S.W.3d at 143 (stating that a parent's abuse of other children in the home can support a finding of endangerment); *Jordan*, 325 S.W.3d at 722 (holding, after giving deference to trial court's credibility determinations, that evidence was legally sufficient that mother knew father was violent, abusive, and had endangered their child in violation of section 161.001(1)(D)); *In re K.C.B.*, 280 S.W.3d 888, 895 (Tex. App.—Amarillo 2009, pet. denied) ("Despite appellant's contention that she did not know of the existence of the methamphetamine lab at the residence where the family lived, the trial court could choose not to believe this denial based strictly on the credibility of the appellant's testimony."); *In re M.R.J.M.*, 280 S.W.3d 494, 504–05 (Tex. App.—Fort Worth 2009, no pet.) (holding the jury could have formed a firm belief or conviction that the father allowed the child to remain in an endangering

environment by ignoring the mother's drug use); *In re E.S.C. and L.M.M.*, No. 14-04-01160-CV, 2006 WL 1148144, at *6 (Tex. App.—Houston [14th Dist.] March 30, 2006, no pet.) (mem. op.) ("The law does not require the State to wait until each child in a family is personally victimized before it may terminate a parent's rights."); *In re S.M.L.*, 171 S.W.3d at 478 ("Whether appellant actually neglected S.M.L. or merely observed it, the trial court could have reasonably inferred that appellant had knowledge of an endangering environment when he left the household for jail a short seventy-three days before."). We overrule I.W.'s first issue on appeal.[6]

## II.  The trial court did not abuse its discretion when it appointed the Department the permanent managing conservator of the children

In his second issue, I.W. contends the trial court's judgment appointing the Department the permanent managing conservator of the children should be reversed and rendered because the Department did not present legally sufficient evidence that returning the children to I.W. would significantly impair their physical health or emotional development. We construe I.W.'s second issue to contend the trial court abused its discretion when it appointed the Department the permanent managing conservator of the children. *See In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (holding that conservatorship determinations are subject to review only for an abuse of discretion).

As explained in *In re J.A.J.*, the nature of the proof addressing a decision to appoint a nonparent conservator differs from the proof addressing a decision to terminate parental rights. *Id.* This difference is reflected in the quantum of proof required for each. A parental termination decision must be supported by clear and

---

[6] Having determined there is legally sufficient evidence that I.W. violated section 161.001(1)(D) of the Texas Family Code, we need not address the trial court's finding that he also violated section 161.001(1)(E). *See In re Z.C.J.L.*, 2013 WL 3477569, at *13, n.7.

convincing evidence, while a finding that appointing a parent as managing conservator would significantly impair a child's physical health or emotional development is governed by the lower preponderance of the evidence standard. *Id.* The different standard of proof affects the standard of review on appeal. Conservatorship determinations are subject to review only for an abuse of discretion and may be reversed only if the decision is arbitrary and unreasonable. *Id.* Under that standard of review, we must indulge every reasonable presumption in favor of the judgment and view the evidence in the light most favorable to the judgment. *In re J.S.G. and J.A.G.*, No. 14-08-00754-CV, 2009 WL 1311986, at *11 (Tex. App.—Houston [14th Dist.] May 7, 2009, no pet.) (mem. op.). As long as there is some evidence of a substantive and probative character supporting the trial court's decision, then the trial court did not abuse its discretion. *Id.*

Here, we have already determined that there was clear and convincing evidence supporting the trial court's termination of I.W.'s parental rights. Moreover, I.W. testified that if the children were returned to his home, they would be cared for in the same way as before. Specifically, D.K. would play a role in caring for the children again and would be the primary caretaker for the three girls. We hold that all of this evidence, examined under the less exacting preponderance of the evidence standard, establishes that the appointment of I.W. as the managing conservator of the children would significantly impair their physical health or emotional development. Accordingly, we conclude that the trial court did not abuse its discretion when it (1) found that the appointment of I.W. was not in the best interest of the children because it would significantly impair their physical health or emotional development; and (2) appointed the Department the permanent managing conservator of the children. *See In re J.T.G.*, No. 14-10-00972-CV, 2012 WL 171012, at *20 (Tex. App.—Houston [14th Dist.] January 19, 2012, pet.

22

denied) (mem. op.).  We overrule I.W.'s second issue on appeal.

## CONCLUSION

Having overruled both of I.W.'s issues on appeal, we affirm the trial court's judgment terminating his parental rights and appointing the Department permanent managing conservator of the children.


/s/    J. Brett Busby
          Justice


Panel consists of Justices Boyce, Jamison, and Busby.