

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-21-00020-CV
_____

IN THE INTEREST OF A.L.G., C.C.A., AND A.R.A., CHILDREN

On Appeal from the 69th District Court
Dallam County, Texas
Trial Court No. 12,359; Honorable Jack Graham, Presiding

June 17, 2021

## MEMORANDUM OPINION

### Before PIRTLE, PARKER, and DOSS, JJ.

Appellant, E.J.A., challenges the trial court's order terminating her parental rights to three of her children, A.L.G., C.C.A., and A.R.A.[1]  In presenting this appeal, appointed counsel has filed an *Anders*[2] brief in support of a motion to withdraw.  We affirm the trial

---

[1] To protect the privacy of the parties involved, we refer to them by their initials.  *See* TEX. FAM. CODE ANN. § 109.002(d) (West 2020).  *See also* TEX. R. APP. P. 9.8(b).  The parental rights of the father of the children were also terminated in the underlying proceeding.  He is not a party to this appeal.

[2] *Anders v. California*, 386 U.S. 738, 87 S. Ct. 1396, 18 L. Ed. 2d 493 (1967).

court's *Order of Termination* but defer ruling on counsel's motion to withdraw. *See footnote* 12, *infra*.

### BACKGROUND

The final hearing in this matter was conducted via "Zoom videoconferencing."[3] The hearing involved three children, fifteen-year-old A.L.G., thirteen-year-old C.C.A., and ten-year-old A.R.A.[4] Evidence was presented to show that the Texas Department of Family and Protective Services became involved with the family in April 2019 when the Department received an alternative report[5] concerning the welfare and safety of then eight-year-old A.R.A. and her then eleven-year-old brother, C.C.A. The report stated that A.R.A. had suffered from chronic lice since the beginning of the 2018 school year and that she came to school "not properly groomed, her hair matted . . . ." Her clothes were dirty, her hair was greasy, she did not appear to be bathed, and there "did not appear to be enough food at the home." The school secretary and registrar for the children's school district testified that "all three of the children are wonderful, sweet kids." However, she said that both A.R.A. and C.C.A were chronically absent from school.[6] While some of the absences were "excused," the children were "over the 90-day rule" and close to being

---

[3] In response to the imminent threat presented by the COVID-19 pandemic, the Texas Supreme Court has issued numerous emergency orders authorizing "anyone involved in any hearing . . . to participate remotely, such as by teleconferencing, videoconferencing, or other means . . . ." One such order was effective as of the date of this hearing.

[4] E.J.A. also had another child; however, that child was over the age of eighteen at the time of the final hearing.

[5] The investigator testified that with this type of report, the Department is to first make contact with the family to attempt to resolve the problems. She testified she did so but she could not get E.J.A. to cooperate.

[6] At this time, A.L.G. was attending school at another campus.

2

reported as truant.  The witness confirmed the reports of lice and that the children often came to school dirty.

The Department investigator testified that the Department made numerous attempts to inspect the home between April and August 2019.  While serving an Order to Aid, the investigator was so alarmed by the condition of the home that she called the code inspector.  The investigator told the court the home was a fire hazard.  There were boxes "all over the place.  There was just a little ways that you could walk in.  There was things placed on top of two water heaters that were next together . . . there was roaches everywhere.  It was—it was just not fit for really anybody to really live in the home."

When the investigator did make contact with the grandmother at the home, the grandmother told her they were sleeping in the car because "the roaches were so bad in the home that they could not even sleep well."  The investigator noted that the food in the home was also "infested" and confirmed that bug infestations are health hazards and are dangerous to the mental and physical welfare of children.  The investigator further opined that the environment in which the children were living was unsafe.  She said the children loved their mother and were very bonded to their grandmother, perhaps even more so than with their mother.  The children's counselor said the same.  Nevertheless, the investigator testified the children were eventually removed from their mother's care for neglect.  After removal, the children were placed with Catholic Charities.  At that time, C.C.A. testified positive for methamphetamine through a hair follicle test.  In October 2019, the children were moved to Amarillo Children's Home where they remained at the time of the final hearing.

The code inspector testified that the home was "very cluttered, lots of stuff everywhere." He noted also that there were electrical problems that needed to be fixed including lack of faceplates on outlets that posed a risk of shock or fire and inappropriate use of extension cords, including one that ran from the house into the outdoor shed. He characterized the clutter and electrical problems as "a fire hazard" and answered affirmatively when asked whether those conditions presented a danger to children residing in that home. The code inspector also noticed the bug infestation and agreed it was above and beyond what would be normal in his line of work.

The investigator told the court that E.J.A. had a "makeshift room" attached to a shed outside the home and that drug paraphernalia was located in that room. The investigator testified that after several attempts, she spoke with E.J.A. and requested that she submit to a drug screen in August 2019. She refused to do so. She also failed to follow through with the safety plan the Department put in place for her and her children and this, along with the condition of the home and her drug use, led to the decision to remove the children. She tested positive for methamphetamine at the time of removal.

The Department caseworker testified E.J.A. completed all of the initial services set forth in the service plan as required for the return of her children to her care; however, by the time of the final hearing, she had not completed an additional required drug treatment assessment or additional therapeutic visits. The caseworker also said E.J.A. had tested positive for methamphetamine in March 2020, and had no additional contact with the Department from March to July 2020.[7] She also told the court that when she visited

_____

[7] There is discussion in the record that at this time, the Department was engaging only in "virtual" activities due to the COVID-19 pandemic.

E.J.A.'s home in September 2020, the boys' room "looked amazing." E.J.A. was repairing the walls and getting the floor ready to put in new carpet. "[I]t looked like a room in progress." However, when the caseworker saw the home two months later,[8] "there was clutter in the room that I had never seen in the house before. And so that was very—that was very concerning to me, because of the progress that had been started, it was just completely different." She said, "it was cluttered and messy again." The caseworker also expressed concern over the mother's appearance, lack of a phone, issues with transportation, and maintaining employment. The investigator said, she "would like to see some consistency and stability before we just give her three kids that will bring more things in her life for her to have to deal with."

At the final hearing, E.J.A. acknowledged she was using methamphetamine in August 2019 and admitted it is "very addictive." She successfully completed a program at Serenity Treatment Center in Plainview, Texas, and testified at the final hearing that she was not using methamphetamine at that time. She did admit, however, that she had relapsed after her treatment and before the final hearing, testing positive for methamphetamine in March 2020. The caseworker testified she had concerns because early in the year, E.J.A. was doing very well and was willing to submit to drug screens. She submitted to two, both of which yielded negative results. Later in the fall of 2020, however, the caseworker noted erratic behavior and a failure to communicate by E.J.A. She also failed to submit to two drug screens. During her testimony, she explained that

---

[8] Access to the home in October was limited due to COVID-19 restrictions.

5

during October and November 2020, she became ill, her mother had a heart attack, and her grandmother broke her arm. She also had some transportation issues at that time.

The counselor for the children spoke to the emotional and mental condition of the children when she first began seeing them and how they progressed since removal from their mother's care and going through the counseling process. The counselor testified that when she first started counseling the children in October 2019, "they all were significantly dealing with posttraumatic stress disorder and generalized anxiety disorder." She answered "[a]bsolutely" when asked whether those conditions stemmed from the environment in which the children were living prior to their removal. She noted that all three children struggled with settling in when they were removed because they were used to a life of instability. They moved from their grandmother's house to a hotel to a home to a friend's house. They often did not stay in one place for more than one or two months. They were used to packing and leaving very quickly. Thus, every time the date of a hearing would approach, the children, especially A.L.G., would prepare to return home. The counselor characterized this false hope as "very harmful" to the children.

The counselor said when she first began seeing the children, A.L.G. was "pretty unruly." He was "defiant. He did not like rules. He was very unstructured and almost borderline belligerent most of the time with authority. He definitely was clear he did not have rules, he was running streets and got to do whatever he wanted to do." She told the court that she has helped A.L.G. work through a lot of his issues but he "still struggles" and still has "a lot of social norms to learn." The caseworker testified that A.L.G. continues to struggle and has not done as well as his siblings in his placement at Amarillo Children's Home.

6

The counselor further testified that C.C.A. was initially "really reserved, almost beaten down." He too did not understand rules, structure, and boundaries but has a "very tender heart." The counselor said C.C.A. "is like a little 30 year old running around in his little body." Through counseling, he adapted to structure and discipline very quickly. He is sweet-natured and calm and is a significant caretaker. He continues to require reminders that he is not the caretaker of his siblings or the adults around him. The caseworker testified that C.C.A. adjusted really well to Amarillo Children's Home. He is "comfortable" and doing well in the program in the home.

The counselor described A.R.A. as being initially "[s]ignificantly traumatized." She "cried a lot. Nightmares. Couldn't sleep. She required a weighted . . . blanket or animal. She needed constant reassurance that she was safe, she was going to be given food, shelter, there wasn't going to be screaming." According to her counselor, A.R.A. has "come tremendously far, a long way" through her counseling. She now has a "lot of self-assurance. She's very confident in herself. She—anxiety is pretty minimal" except for when she visits with her family or when she thinks of returning home. The caseworker testified that A.R.A. has "done really well" in her placement at Amarillo Children's Home and is "very happy." She "is thriving there. She loves her house parents and she loves all the other girls in the home . . . ."

In speaking of the children's future, the counselor testified that she had "no clue if [E.J.A.] is truly adequately clean." She said the children love their mother but "talk about life being how mom relapses over and over again, and right now we've been having erratic behavior on mom's behalf that shows concerns, and even the kids have concerns. And I'm not really showing consistency in her ability to parenting [sic] them without grandma,

7

and grandma is very fragile and weak right now." The counselor testified that the first six visits between E.J.A. and her children indicated she was "in a pretty good place." She "took ownership," told the children she had failed them, had not been a good mother, had chosen drugs over them, and had allowed them to see things. One of those things, according to the counselor was violence in relationships, including "gun in the mouth violence." The counselor said E.J.A. "really did some good therapeutic things" but then "all of a sudden, she started no call/no show" and began exhibiting concerning behavior. She lost weight and her physical appearance declined. The counselor said even C.C.A. made the comment, "I'm scared she's going back."

The counselor testified that with regard to returning to their mother's care, the children are "very conflicted in therapy." In front of E.J.A., "they're very much, I love you, and that is the picture they do describe." They love their mother, do not want to hurt her, and worry about her. All three children have, at times, expressed to the counselor a desire not to return home and that they have "their adoption situation picked out." However, A.L.G. has more frequently expressed a desire to return home. That desire stems from his wish to help E.J.A. clean the house and "take care of things" now that his older brother has moved out of the home. The counselor said she believes A.L.G. really wants to return home to his grandmother as they are very bonded. The counselor told the court that A.R.A. does not want to return to her mother's care. She loves her but wants to remain in foster care because she does not feel safe with her mother. C.C.A. "would like to have it both ways." He would like to go home and care for his mother, his

8

grandmother, and A.L.G.[9] but he also wants the stability and safety of foster care. He is tired of the relapse, clean cycle and the stability, instability cycle. He "wants that to be done." The counselor expressed concern over the children continuing to have contact with the mother because that will mean they will grow up in a children's home and that is unfair to them when they have learned to live within the rules, even when their mother has encouraged them to do otherwise. The counselor believes that with proper supervision and care, "these kids are able to be college bound, positive, productive citizens in the society." The caseworker told the court that while it is never the Department's goal for children to "age out" at the children's home, it is a possibility, and it would be a stable environment for them.

E.J.A. testified as to her current status and plans for the children. She told the court that at the time of the final hearing, she was not using methamphetamine and would be willing to submit to a drug screen that day. She expressed her love for her children and her desire for them to come home. She said, "I will be willing to do anything the Judge requires me to do, because I love my kids, and they're—they're worth everything to me." E.J.A. also told the court she had been working at H&H Farms for about two or three months, working six days a week making ten dollars per hour. She also said she had a prepaid cell phone.[10] She further testified to changes she had made to her home for the benefit of her children. She showed the court pictures of the current state of the home, showing beds and dressers for the children, along with new carpet and paint in the

---

[9] C.C.A. indicated to his counselor that he needs to be able to take care of A.L.G. because A.L.G. "can't stay out of trouble, and [A.L.G] is going to be a mess."

[10] She testified she sometimes had problems paying for the service and her service would be interrupted.

bedrooms. She said she had addressed the bug problem with "bug bombs" and planned to have an exterminator out to spray again once she had sufficient funds to do so. The caseworker testified that when she visited the home in the latter portion of 2020, the grandmother showed her the electrical repairs, including new breaker boxes, faceplate covers, and electrical upgrades.[11] The family told her they had spent about $5,000 to repair the electrical issues in the home. The caseworker testified she did not see any electrical cords running from the home to the outdoor shed. A picture showing the electrical cord had been cut was admitted into evidence. The caseworker noted that the home had a new refrigerator but did not have a working stove. E.J.A. testified she had obtained a new stove, had a functioning microwave, and was able to cook in the kitchen.

At the close of the hearing, the attorney ad litem declined to make a recommendation to the court regarding termination of E.J.A.'s parental rights. Rather, he reiterated the wishes of A.L.G. and C.C.A., telling the court they "would like to return home with her their mother and maintain a relationship with her." However, at that time, A.R.A. did "not want to go home, and in fact, is fearful of going home at this time." The CASA representative recommended that E.J.A.'s parental rights be terminated and opined it was in the children's best interests that the court do so to provide stability. The counselor opined that "there's too many unknown pieces" for her to be able to "safely recommend" that the children be placed in E.J.A.'s care. Likewise, the caseworker stated she did not feel comfortable returning the children to E.J.A.'s care at that time.

---

[11] Speer Electric performed the electrical work. The code inspector agreed this was a reputable company.

Based on the Department's case, the trial court found clear and convincing evidence to support termination of E.J.A.'s parental rights on the following statutory grounds:

> (D)    knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger[ed] the physical or emotional well-being of the children;
>
> (E)    engaged in conduct or knowingly placed the children with persons who engaged in conduct which endanger[ed] the physical or emotional well-being of the children;
>
> (N)    constructively abandoned the children who have been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months and: (1) the Department has made reasonable efforts to return the children to the mother; (2) the mother has not regularly visited or maintained significant contact with the children; and (3) the mother has demonstrated an inability to provide the children with a safe environment;
>
> (O)    failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the [Department] for not less than nine months as a result of the child's removal from the parent under chapter 262 for the abuse or neglect of the child; and
>
> (P)    used a controlled substance, as defined by Chapter 481 , Health and Safety Code, in a manner that endangered the health or safety of the children, and (1) failed to complete a court-ordered substance abuse treatment program; or (2) after completion of a court-ordered substance abuse treatment program continued to abuse a controlled substance.

*See* Tex. Fam. Code Ann. § 161.001(b)(1) (D), (E), (N), (O), and (P) (West 2020). The trial court also found that termination was in the children's best interests. *Id.* at § 161.001(b)(2).

11

The Texas Family Code permits a court to terminate the parent-child relationship if the Department establishes one or more acts or omissions enumerated under section 161.001(b)(1) and termination of that relationship is in the children's best interests. *Id.* at § 161.001(b)(1), (2). *See Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976). The burden of proof is clear and convincing evidence. TEX. FAM. CODE ANN. § 161.206(a) (West 2020). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* at § 101.007.

Only one statutory ground is needed to support termination though the trial court must also find that termination is in a child's best interest. *In re K.C.B.*, 280 S.W.3d 888, 894-95 (Tex. App.—Amarillo 2009, pet. denied). In reviewing a termination proceeding, the standard for sufficiency of the evidence is that discussed in *In re K.M.L.*, 443 S.W.3d 101, 112-13 (Tex. 2014). In reviewing a best interest finding, appellate courts consider, among other evidence, the factors set forth in *Holley*, 544 S.W.2d at 371-72.

Pursuant to *In re N.G.*, 577 S.W.3d 230, 235-36 (Tex. 2019), this court must also review the trial court's findings under section 161.001(b)(1)(D) or (E) to determine if either finding is supported by clear and convincing evidence even when another ground for termination is sufficient because of the potential consequences for future terminations under subsection (M). *Id.* at 234. Subsection (M) provides for termination of parental rights to another child if the parent has previously had parental rights terminated based on a finding that the parent's conduct violated subsection (D) or (E). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(M). An appellate court denies a parent a "meaningful appeal and

eliminates the parent's only chance for review of a finding that will be binding as to parental rights to other children" if that court does not review a termination based on either of those grounds. *In re N.G.*, 577 S.W.3d at 235 (citing *In re S.K.A.*, 236 S.W.3d 875, 890 (Tex. App.—Texarkana 2007, pet. denied)).

### SECTION 161.001(B)(1)(D)

Subsection (D) requires a showing that the environment in which the children were placed posed a danger to the children's physical or emotional health, and it permits termination based on a single act or omission by the parent. *In re M.M.*, 584 S.W.3d 885, 889-90 (Tex. App.—Amarillo 2019, pet. denied) (citing *In re J.A.S.*, No. 07-12-00150-CV, 2012 Tex. App. LEXIS 8087, at *14 (Tex. App.—Amarillo Sept. 25, 2012, no pet.) (mem. op.) (citing *In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied)). Subsection (D) concerns the children's living environment, rather than the parent's conduct, though parental conduct may produce an endangering environment. *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). It is not necessary that the children's living environment directly threaten the children or that the children be injured, but the parent must at least be aware of the potential for danger to the children in such an environment and must have disregarded that risk. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Illegal drug use and criminal activity support a conclusion that the children's surroundings endanger their physical or emotional well-being. *In re M.M.*, 584 S.W.3d at 890 (citing *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)). The relevant time frame under this subsection is prior to the children's removal. *In re M.M.*, 584 S.W.3d at 890 (citing *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied)).

**SECTION 161.001(B)(1)(E)**

Subsection (E) permits termination when clear and convincing evidence shows that the parent has engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the children's physical or emotional well-being. *See* § 161.001(b)(1)(E). Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the children's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. *In re J.T.G.*, 121 S.W.3d at 125. Termination under subsection (E) must be based on more than a single act or omission. *In re M.M.*, 584 S.W.3d at 890. That is, a voluntary, deliberate, and conscious course of conduct by a parent is required. *Id.* (citation omitted). Thus, while both subsections (D) and (E) focus on endangerment, they differ regarding the source and proof of endangerment. *In re M.M.*, 584 S.W.3d at 890 (citing *In re S.M.L.*, 171 S.W.3d at 477). To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the children nor are the children required to actually suffer injury. *In re M.M.*, 584 S.W.3d at 890 (citing *Texas Dep't of Human Services v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) (reversing appellate court's holding that father's imprisonment did not endanger the emotional and physical well-being of a child)).

14

*ANDERS V. CALIFORNIA*

The procedures set forth in *Anders v. California*, pertaining to a non-meritorious appeal of a criminal conviction, are applicable to the appeal of an order terminating parental rights. *See In re A.W.T.*, 61 S.W.3d 87, 88 (Tex. App.—Amarillo 2001, no pet.). The brief filed in this appeal meets the requirements of *Anders* by presenting a professional evaluation of the record and demonstrating why there are no arguable grounds for reversal of the trial court's termination order.

In support of his motion to withdraw, counsel certifies he has conducted a conscientious examination of the record, and in his opinion, the record reflects no potentially plausible basis to support an appeal. *In re D.A.S.*, 973 S.W.2d 296, 297 (Tex. 1998). Counsel has demonstrated that he has complied with the requirements of *Anders* by (1) providing a copy of the brief to E.J.A. and (2) notifying her of her right to file a *pro se* response if she desired to do so. *Id.* By letter, this court also granted E.J.A. an opportunity to exercise her right to file a response to counsel's brief, should she be so inclined. She did not file a response and the Department notified this court it would not file a response unless specifically requested to do so. No such request was made.

**ANALYSIS**

By the *Anders* brief, counsel discusses potential issues regarding procedural due process, the sufficiency of the evidence to support the grounds set forth in the termination order, and the sufficiency of the evidence supporting the trial court's finding concerning the best interests of the children. In his evaluation, he then concludes there were no due process violations, and the evidence is legally and factually sufficient to support termination of E.J.A.'s parental rights.

As in a criminal case, we have independently examined the entire record to determine whether there are any non-frivolous issues that might support a reversal on appeal. *See Penson v. Ohio*, 488 U.S. 75, 82-83, 109 S. Ct. 346, 102 L. Ed. 2d 300 (1988); *Stafford v. State*, 813 S.W.2d 503, 511 (Tex. Crim. App. 1991). Our independent review supports termination under subsections (D) and (E). *See In re N.G.*, 577 S.W.3d at 235-36. Based on this record, we conclude that a reasonable fact finder could have formed a firm belief or conviction that grounds for termination existed and that termination of E.J.A.'s parental rights was in the children's best interests. *See* TEX. FAM. CODE ANN. § 161.001(b)(1), (2). *See also Gainous v. State*, 436 S.W.2d 137, 137-38 (Tex. Crim. App. 1969). Having reviewed the entire record, we agree with counsel that there are no plausible grounds for reversal on appeal.

## CONCLUSION

We affirm the trial court's order terminating E.J.A.'s parental rights.[12]

Patrick A. Pirtle
Justice

---

[12] In the absence of additional grounds for withdrawal, in the context of a proceeding for termination of parental rights, a motion to withdraw may be premature. *See In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016) (per curiam) (holding that courts have a duty to see that withdrawal of counsel will not result in prejudice to the client). In light of *In re P.M.*, we call counsel's attention to the continuing duty of representation through the exhaustion of proceedings, which may include the filing of a petition for review in the Texas Supreme Court. Accordingly, we take no action on counsel's pending motion to withdraw.