

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-22-00118-CV

———————————————————

IN THE INTEREST OF M.R., A CHILD

---

On Appeal from the 30th District Court
Wichita County, Texas
Trial Court No. DC30-CP2021-1723

---

Before Womack, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Wallach

# MEMORANDUM OPINION

The Texas Department of Family and Protective Services (the Department) brought this suit to terminate the parental rights of D.R. (Father) and A.T. (Mother) to their son M.R. (Matthew).[1] The trial court terminated the parent–child relationship between Mother and Matthew on three of the termination grounds alleged by the Department under Texas Family Code Section 161.001(b)(1) and terminated the parent–child relationship between Father and Matthew on two grounds. *See* Tex. Fam. Code Ann. § 161.001(b)(1). In two issues, Father challenges the evidentiary sufficiency to support those two grounds. Mother argues in two issues that she was deprived of due process of law because she was never provided oral warnings mandated by the Texas Family Code and that the trial court abused its discretion by denying her oral motion for continuance. We will affirm the trial court's judgment.[2]

---

[1]We use aliases to refer to the child and his family members. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]The Department pointed out in its brief that in a form that Mother had submitted to the Department, Mother had claimed that Matthew "may be of American Indian or Alaskan Native descent or heritage" due to Mother's claimed tribal affiliation; that in the space asking for the tribe's name, Mother wrote "Cherokee" and "Commanche" [sic] as the tribes with which she was affiliated; and that at trial, there was no indication that any Cherokee tribe had been notified of the proceedings in compliance with the Indian Child Welfare Act (ICWA). *See* 25 U.S.C.A. § 1912(a). Via a supplemental clerk's record requested by the Department, we determined that the notification to the Comanche Nation had not been sent in the method required by the ICWA. *See id.* We abated the appeal for proper notification to be sent and for the trial court to make findings about whether Matthew is an Indian child and whether the ICWA applies to this case. After the trial

**Father's Issues**

The trial court terminated Father's parental rights under the grounds provided in Texas Family Code Section 161.001(b)(1)(E) and (N). Father challenges the legal sufficiency of the evidence to support the Subsection (N) ground and the legal and factual sufficiency to support the Subsection (E) ground.

## I. Standard of Review

For the trial court to terminate the parent–child relationship, the party seeking termination—in this case, the Department—must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Texas Family Code Section 161.001(b)(1) and (2) that termination is in the child's best interest.[3] *Id.* § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

To determine whether the evidence is legally or factually sufficient in parental–rights termination cases, we must decide whether a reasonable factfinder could form a firm belief or conviction that grounds exist for termination. *Z.N.*, 602 S.W.3d at 545; *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). The factfinder is the sole judge of the

court found that Matthew is not an Indian child and that the ICWA does not apply, we reinstated the appeal.

[3]Neither parent challenges the trial court's best-interest finding.

witnesses' credibility and demeanor. *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022); *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). As such, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

In reviewing a legal sufficiency challenge, we look at the evidence in the light most favorable to the challenged finding. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). In reviewing the factual sufficiency of the evidence, on the other hand, we must perform "an exacting review of the entire record." *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014).

## II. Establishing Termination under Section 161.001(b)(1)(E)

Subsection (E) allows for termination when a parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct [that] endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(E). A Subsection (E) finding provides a basis to terminate that

4

parent's rights to other children. *In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019) (citing Tex. Fam. Code Ann. § 161.001(b)(1)(M)). Consequently, when a parent challenges a Subsection (E) finding, due process and due course of law demand that we address the finding and detail our analysis. *Id.* at 235, 237; *see also In re C.W.*, 586 S.W.3d 405, 406 (Tex. 2019) (relying on *N.G.* and holding same). We therefore begin our analysis with Father's second issue challenging the Subsection (E) ground.

"Endanger" in this context "means to expose to loss or injury" or "to jeopardize." *J.F.-G.*, 627 S.W.3d at 312 (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). The term means "more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment." *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012) (quoting *Boyd*, 727 S.W.2d at 533). However, endangering conduct need not be directed at the child, nor must the child actually suffer injury. *J.F.-G.*, 627 S.W.3d at 312. Endangerment can result not only from a parent's acts, but also from a parent's failures to act. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re M.L.L.*, 573 S.W.3d 353, 363 (Tex. App.—El Paso 2019, no pet.) ("Neglect can be just as dangerous to the well-being of a child as direct physical abuse.").

If the Department relies on the parent's committing an unlawful act to show endangerment, the Department "bears the burden of showing how the offense was part of a voluntary course of conduct endangering [a child's] well-being." *E.N.C.*, 384 S.W.3d at 804. "Evidence of criminal conduct, convictions, imprisonment, and

their effects on a parent's life and ability to parent" is evidence that may be used to establish an endangering course of conduct because a child's physical and emotional well-being can be endangered by conduct that "[r]outinely subject[s] children to the probability that they will be left alone because their parent is in jail" or "that subjects a child to a life of uncertainty and instability." *In re J.B.*, No. 14-20-00766-CV, 2021 WL 1683942, at *5 (Tex. App.—Houston [14th Dist.] Apr. 29, 2021, pet. denied) (mem. op.); *see also M.L.L.*, 573 S.W.3d at 363 (stating that "[c]onduct that subjects a child to a life of uncertainty and instability" endangers the child).

## III. Trial Evidence

The case was tried on March 15, 2022. The trial court took judicial notice of its case file. *See In re M.C.*, No. 02-15-00290-CV, 2016 WL 354186, at *2 (Tex. App.—Fort Worth Jan. 28, 2016, no pet.) (mem. op.) (stating that trial court may take judicial notice of the existence of its own orders but may not take judicial notice of the truth of allegations in those orders). The witnesses at trial were Father, the Department's caseworker, the caseworker's supervisor, and Matthew's foster mother. Father and the caseworker both testified about the circumstances leading to Matthew's removal and Father's actions during the case. From their testimony, the following information was elicited.

- At the time of trial, Matthew was seven months old. Matthew had been taken into the Department's care in September 2021, shortly after his birth. The initial basis for the Department's involvement in the case was that Matthew and Mother tested positive for methamphetamine at Matthew's birth. Matthew had health issues, including withdrawal

6

symptoms, that required him to stay in the hospital for approximately three weeks.

- At the time of trial, Father was incarcerated for burglary of a building. Father had been incarcerated twice before,[4] but this was his first time in state jail. Father had been convicted on October 15, 2021,[5] and was serving a one year's sentence of confinement. Father acknowledged that as of his conviction date, he had "exactly eight days of credit," but he testified that he believed that he would be released in July 2022 because he had "earned good time." Father did not explain the reason for that belief. *See* Tex. Code Crim. Proc. Ann. art. 42A.559 (stating that a defendant in a state-jail-felony facility does not earn good-conduct time for time served in the facility but may be awarded diligent-participation credit as provided in the article).

- Father and Mother had another child together, Keith. The Department had previously removed Keith from his parents' care, and both parents' parental rights to Keith had been terminated.

- Father did not participate in any services in Keith's case.[6] Father told his caseworker in this case that he had been unaware that his rights to Keith

---

[4]The affidavit supporting the Department's application for emergency removal stated that Father had prior arrests for theft, theft of livestock, assault causing bodily injury, unauthorized use of a motor vehicle, aggravated assault, credit-card or debit-card abuse, evading arrest, and criminal mischief, but at trial the Department did not introduce any evidence regarding the basis for Father's prior arrests or convictions. Thus, the only trial evidence establishing Father's prior criminal history was his admission that he had been incarcerated twice before for unspecified offenses. *See In re M.C.*, 2016 WL 354186, at *2.

[5]The record leaves unclear when Father committed the offense or when he was initially arrested, but testimony suggested that Father appeared in court on October 15, 2021 for a hearing regarding a plea bargain and was convicted on that date, and he has been in county jail or the state-jail facility since that time.

[6]According to the affidavit supporting the application for emergency services for Matthew, Father's failure to participate in services in Keith's case was the basis on which Father's rights to Keith were terminated. No evidence on that point was introduced at trial, however.

had been terminated, and he testified that he was never given a service plan for that case. However, Father also testified that he went to only one court hearing for Keith's case and attended no other court dates. He explained his lack of participation by saying that "all the COVID thing happened and there was never nothing else said." Father did not say that he had ever contacted the caseworker in that case to inquire about the case's status or to ask to see Keith.

- Aside from Matthew, Mother had a total of four other children, including Keith, and her rights to each child had been terminated. Father testified that he was aware that Mother was a drug user and that her rights to her other children had been terminated "due to her drug addiction tendencies."

- Father has also used drugs.[7]

- Father and Mother broke up when Mother was "five, six months" into her pregnancy.[8] Father claimed that they broke up because he believed that Mother was cheating on him.[9]

- Father provided no assistance to Mother while she was pregnant with Matthew because he was not sure if the child was his.[10]

- Father went to the hospital when Matthew was born because Mother asked him to "bring her a couple of things," and while he was there, he did not go see Matthew, who was in the NICU. Father claimed that he

---

[7]The affidavit supporting the application for emergency services stated that Keith had been removed "due to concerns for illegal drug use," but evidence relating to the reason for Keith's removal was not introduced at trial.

[8]Father's testimony was not clear as to timing, i.e., whether Mother had told him about the pregnancy when she was five or six months pregnant and they broke up soon after, or whether she had told him about the pregnancy soon after learning of it and they broke up five or six months later.

[9]Father's testimony suggested that he may have been dating another woman while still in a relationship with Mother.

[10]Mother named only Father as the potential father.

8

was unaware that Mother had had any problems with the pregnancy, even though Mother gave birth at thirty-three weeks. Father "didn't really notice" that the birth was early.

- On September 10, 2021, the trial court signed an order for genetic testing. The caseworker testified that the Department's investigator told Father about the order, but Father denied learning about the order before his incarceration, and the caseworker acknowledged that she had no personal knowledge of what the investigator had told Father.

- According to the caseworker, in September 2021—before Father was incarcerated—she had made several attempts to meet with Father. She went to his house but was told he was at work. She then attempted to contact him at work but had to leave a message with his employer. The caseworker tried two times to contact him at work. She was finally able to reach him by phone on September 28, 2021, and he told her that he would be home the following day during a specific time frame. The caseworker went by at that time, and Father was not at home.[11]

- At some point before Father's incarceration and before DNA testing confirmed Father's paternity, the caseworker told Father that he could drug test and start working services "in case [Father was the] dad" and that doing so would "give [Father] a head start, even if it's just NA meetings or even if it's just a parenting class or a support group, even if it's just drug testing." Father chose not to do so.

- Father moved at some point before his incarceration but did not tell the caseworker where he had moved. He did not tell the caseworker before October 15, 2021 that he could be in jail after that date, and he did not tell her when he transferred from the county jail to the state-jail facility.

---

[11]In the affidavit supporting the application for emergency services, the Department's investigator stated that after Matthew's birth, she had attempted to contact Father by telephone. She was unable to leave a voicemail, so she sent him a text message asking him to contact her. The affidavit further stated that multiple attempts were made to contact Father by phone and that he had refused to return phone calls. However, no testimony about those unreturned phone calls or her text message were introduced at trial.

- Father never asked to see Matthew, either before or after his incarceration.

- Father claimed that before his incarceration, he was not aware that there was an open CPS case involving Matthew, but he also testified that a few days after Matthew's birth, Mother had told him that the Department had taken Matthew into its care.

- DNA results established Father's paternity in October 2021, shortly after his October 15 confinement. The caseworker visited him at the county jail before his transfer to the state-jail facility and gave him some releases, medical-history forms, and a form to request an attorney. He declined to sign the releases or medical-history forms. The following month, the trial court signed an order establishing Father as Matthew's biological father.

- In a December 2021 letter, the caseworker requested that Father ask what services and support groups were available in the facility.

- In January 2022, the caseworker sent Father his family plan of service and asked him to let her know what services and support groups he had been participating in. In mid-January, she sent another letter asking about services. She also sent him "coping skill [worksheets] and support group or support [worksheets]." Father responded by sending those worksheets back to her in mid-February. The caseworker testified that this mailing included a letter stating that Father was "still waiting on services available to [him]" and that he had been denied a psychological evaluation "because they wouldn't pay for it." With that letter, he included a document showing that he had requested a "mental health sick call," which had been scheduled, but nothing showing that he had been denied a psychological evaluation.

- At the end of February, the caseworker sent him a letter asking if he had any documentation of the psychological evaluation's denial, and she sent another copy of the service plan because Father had not signed and returned the first copy she had sent. Father never sent that service plan back, never returned the medical-release forms, and did not respond to the caseworker's letter. The caseworker sent Father a total of six letters to the state-jail facility, but he responded to only two.

10

- Father's service plan accounted for the fact that Father might not have been able to perform some of his services while in the state-jail facility. The plan stated that during his incarceration, Father would need to complete certain classes and evaluations—parenting classes; substance-abuse classes; and a psychological evaluation, a mental-health assessment, and individual counseling—only if they were offered at the facility.

- If those services were not available, Father was to complete them upon his release. However, for the parenting and substance-abuse classes, the caseworker also sent Father packets of worksheets to complete as an alternative to the classes, or in addition to the classes if the classes were offered. The caseworker testified that Father returned the parenting packet but that Father's response to the packet did not indicate that he had learned appropriate parenting from the information provided to him.

- The caseworker further testified that Father did not return the substance-abuse packet; Father testified that he had done so.

- The caseworker testified that Father never provided her with information about what services were available to him in the state-jail facility, despite her multiple requests that he do so. His only response to her on that point was his mid-February 2021 letter—one of the few responses he sent to her letters—in which he said that he was still waiting for information. Father, however, testified that he had told the caseworker that parenting classes, psychological evaluations, mental health assessments, and individual counseling were not available at the facility.

- Father did not testify that substance-abuse classes were not available at his facility.

- Father's service plan also required him to undergo random drug screening if released. Father testified that it was possible to have a drug screen while incarcerated but that he had never been asked to do so.

- Father testified that before his incarceration, he worked as a handyman for a landlord and lived in one of her properties.[12] Father asserted that his employer had given him the house, which he said was worth "probably 25, 30,000," but he acknowledged that she had not legally transferred ownership to him. He testified that the employer told him that he "could live there from now on and somewhere later we'd take care of the paperwork." He produced no written agreement to that effect and no documentation showing that he had a lease or any other interest in the property.

- Father never provided the caseworker with proof of income, and he did not tell her his plan for supporting Matthew's needs either before or after his release.

- The caseworker testified that Father had never asked how Matthew was doing or to see a picture of Matthew, but she acknowledged that she generally provided him with updates about Matthew when she wrote to him. The caseworker stated that Father never included anything in his letters "that show[ed] that interest in really raising" Matthew. Father sent Matthew a card while incarcerated.

## IV. Evidentiary Sufficiency of Subsection (E) Ground

Father argues that the facts in this case are nearly identical to the facts in *In re D.T.*, 34 S.W.3d 625, 640 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g), in which this court held that the evidence was factually insufficient to show endangerment even though it was legally sufficient. We disagree. In *D.T.*, the child's mother had become incarcerated for writing bad checks, but before her incarceration, she had adequately cared for the child. *Id.* at 628. The Department's representative

---

[12]The Department's attorney asked Father if it was true that the people who lived in his employer's properties were "typically drug users and criminals," but Father responded that the assertion was not true "to [his] knowledge," and the Department did not put on any evidence to support the assertion.

testified that the Department had no reason to remove the child other than the mother's incarceration, that the child's mother initiated frequent contact with the caseworker while she was incarcerated to ask about her child, and that the mother did everything she could while in jail to comply with her service plan.[13] *Id.* at 629, 640.

Here, the Department did not seek termination only because Father had become incarcerated. Father was aware that Mother was pregnant, that he could be the father, and that Mother was a drug user—to the point that she had her parental rights to four other children terminated because of it—but he did not do anything to try to stop her drug use. "[A] parent's knowledge of the other parent's drug use during pregnancy and corresponding failure to attempt to protect the unborn child from the effects of that drug use can contribute to an endangering environment and thus support an endangerment finding." *J.W.*, 645 S.W.3d at 749–50 (citing with approval cases upholding endangerment finding when the father knew of the mother's drug use during pregnancy and yet neither reported her to the Department nor tried to ensure that she received substance-abuse treatment); *see also In re J.B.D.*, No. 12-19-00399-CV, 2020 WL 2610756, at *6 (Tex. App.—Tyler May 21, 2020, no pet.) (mem. op.).

---

[13]The mother also left other children behind in Montana when she left that state to avoid arrest for writing bad checks, and those children were placed in foster care. *Id.* at 637. "However, the record [wa]s silent as to any factual details regarding whether she, herself, initiated the placement for their protection or whether she simply abandoned them when she fled." *Id.* at 637–38.

Father contends that he had no obligation to ensure Matthew's safety while Mother was pregnant because he was not certain that Matthew was his child. That is, Father argues that a man's question about his paternity of a child excuses him from taking action to protect the child from the mother's drug use. Several courts of appeals, including this one, have held that in evaluating endangerment, a factfinder may consider evidence of a father's behavior that occurred before his paternity was confirmed. *See, e.g., In re N.N.M.*, No. 04-19-00369-CV, 2020 WL 4808704, at *1, *5 (Tex. App.—San Antonio Aug. 19, 2020, no pet.) (mem. op.); *In re J.W.S.*, No. 06-14-00018-CV, 2014 WL 3013352, at *6 (Tex. App.—Texarkana July 2, 2014, no pet.) (mem. op.); *see also In re J.H.G.*, No. 01-16-01006-CV, 2017 WL 2378141, at *6 (Tex. App.—Houston [1st Dist.] June 1, 2017, pet. denied) (mem. op.) (stating that knowledge of paternity is not a prerequisite to showing endangerment under Section 161.001(b)(1)(E)); *In re K.E.S.*, No. 02-11-00420-CV, 2012 WL 4121127, at *5 (Tex. App.—Fort Worth Sept. 20, 2012, pet. denied) (mem. op. on reh'g) (same). Further, the trial court did not have to believe Father's testimony that Mother had cheated on him or that he had doubts about his paternity.

Additionally, the trial court had evidence from which it could believe that, despite Father's admitted drug use, Father did not participate in the substance-abuse assessment included in his service plan. Father provided no evidence that he could not obtain one at the state-jail facility, and the caseworker testified that Father did not return the substance-abuse packet that she had sent to him. *See J.O.A.*, 283 S.W.3d at

14

346 (stating factfinder is sole judge of credibility). The trial court also had evidence that Father did not comply with the caseworker's repeated requests to determine which services were available in his facility and did not complete other paperwork that she had asked him to complete, such as the medical-release forms. *See In re J.G.*, No. 02-21-00257-CV, 2022 WL 187983, at \*9 (Tex. App.—Fort Worth Jan. 20, 2022, no pet.) (mem. op.) (stating court may consider failure to complete a service plan as part of its endangering-conduct analysis); *cf. R.S.S. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-22-00076-CV, 2022 WL 2760116, at \*4 (Tex. App.—Austin July 15, 2022, no pet.) (mem. op.) (stating incarceration does not excuse a parent's failure to complete services available to him while incarcerated).

Additionally, Father made no effort to see Matthew before his incarceration, even though he went to the hospital when Mother was in labor; did not do any services before his incarceration despite knowing he could be the child's father; and expressed little curiosity about his son to the caseworker after his paternity was confirmed. *See In re S.M.L.*, 171 S.W.3d 472, 480 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (concluding that father's lack of concern for daughter's well-being was evidence of endangerment) *overruled in part on other grounds by Interest of L.C.L.*, 599 S.W.3d 79, 85 (Tex. App.—Houston [14th Dist.] 2020, pet. denied); *cf. J.B.D.*, 2020 WL 2610756, at \*6 (noting that a parent's lack of contact with a child may endanger a child's emotional well-being). This behavior was consistent with Father's previously suggested apathy regarding his parental rights to his son Keith. Father was

15

incarcerated—for at least the third time—and thus could not at that time provide Matthew with a safe and stable home, and Father's testimony was unclear about whether he would have stable housing upon his release. *See In re J.B.*, 2021 WL 1683942, at \*5; *In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (concluding that incarceration can be considered as endangering conduct when it affects a parent's ability to ensure the safety and well-being of the child); *see also C.M.M. v. Dep't of Fam. & Protective Servs.*, Nos. 14-21-00702-CV, 14-21-00730-CV, 2022 WL 1789925, at \*12 (Tex. App.—Houston [14th Dist.] June 2, 2022, no pet.) (mem. op.) (stating that evidence regarding the parent's lack of stable housing can be evidence of endangerment).

From this evidence, a factfinder could have reasonably formed a firm conviction or belief that the Department had proven that Father's actions and his failures to act endangered Matthew's physical or mental well-being. The evidence was therefore factually sufficient. Because the evidence was factually sufficient, it was also legally sufficient. *See In re A.S.*, No. 02-16-00076-CV, 2016 WL 3364838, at \*7 (Tex. App.—Fort Worth June 16, 2016, no pet.) (mem. op.).

We overrule Father's second issue. Accordingly, we need not address his first issue, and we affirm the termination decree as to Father. *See M.L.L.*, 573 S.W.3d at 360–61 (noting that only one Subsection (b)(1) ground is necessary for termination).

**Mother's Issues**

Mother does not challenge the evidentiary sufficiency to support termination, and we therefore omit a recitation of the background facts relevant to the termination grounds as to Mother.

## I. Family-Code Warnings

Mother argues under her first issue that she was never provided with the oral warning required by Texas Family Code Section 236.006. *See* Tex. Fam. Code Ann. § 263.006. That section applies when a trial court has rendered an order appointing the Department as temporary managing conservator, and it provides that from that point on, at the status hearing and every permanency hearing, "the court shall inform each parent in open court that parental and custodial rights and duties may be subject to restriction or to termination unless the parent or parents are willing and able to provide the child with a safe environment." *Id.* Mother asserts that she never attended a court hearing "and, therefore, never received the required warning in open court."

The service plan that Mother signed includes a written warning about the requirement to provide a safe environment for Matthew, but the Department acknowledges that she never received the warning from the trial court personally in open court. It argues, however, that Mother failed to preserve this argument for appeal. We agree. Nothing in the record shows that Mother ever objected in the trial court that she had not received the proper warnings, and she has therefore failed to

preserve this complaint. *See* Tex. R. App. P. 33.1; *In re M.R.*, No. 02-17-00071-CV, 2017 WL 3429147, at *5 (Tex. App.—Fort Worth Aug. 10, 2017, no pet.) (mem. op.).

Also under this issue, Mother contends that she was never "served with citation of any pleading seeking termination of her parental rights." She acknowledges that she signed a waiver of service at the Department's office. In that waiver, Mother acknowledged that she had received the Department's petition and understood its contents, and she stated that she did not want to be served:

> I acknowledge that I have been provided a copy of the Original Petition for Protection of a Child, For Conservator, and for Termination in Suit Affecting the Parent-Child Relationship and Order Setting hearing filed in this case. I have read and understand the contents of those documents. I understand that the Texas Rules of Civil Procedure require, in most instances, that a party or respondent be served with citation. I do not want to be served with citation, and I waive the issuance and service of citation. I enter my appearance in this case for all purposes.

Mother asserts, however, that the record does not reflect that she received the advice of counsel before signing the waiver. The rule governing waiver of service does not provide that a waiver of service is ineffective if the party signing the waiver does not receive an attorney's advice before signing it, and Mother cites no other authority for that proposition. *See* Tex. R. App. 38.1(i); Tex. Fam. Code Ann. § 102.0091. Mother did not raise any objection below to the waiver's effectiveness. *See* Tex. R. App. P. 33.1. She also fails to explain how she was harmed by the failure to receive advice of counsel before signing. *See* Tex. R. App. P. 44.1.

Mother further asserts in one sentence that her failure to receive the warnings combined with the lack of service—despite her signing the waiver of service—"falls below the standard of due process or fundamental fairness guaranteed by the Texas Constitution and the United States Constitution." However, she does not expound this argument, cites no authority supporting it, and refers to nothing in the record indicating that she suffered any harm from signing the service waiver or failing to receive the statutory warnings. *See* Tex. R. App. P. 38.1(i); *see also Velasco v. Ayala*, 312 S.W.3d 783, 798 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (noting that due process requires that a defendant be served or waive service). We overrule her first issue.

## II. Continuance

Under her second issue, Mother contends that the trial court abused its discretion by overruling her oral motion for continuance made at the start of trial. Mother asserts that a continuance should have been granted because she could have decided "to step up and start to work [her] services," but this assertion is purely hypothetical. While the case was pending, Mother did not complete her drug assessment, psychological assessment, parenting classes, and individual counseling; did not provide proof of legal income; participated in only two of her requested drug screens; and did not attend any visitation with Matthew. Mother cites no authority for her assertion that, despite her almost total lack of participation in the case to that

19

point,[14] the trial court abused its discretion by denying her motion for continuance because she might have behaved differently in the future. *See* Tex. R. App. P. 38.1(i).

More importantly, Civil Procedure Rule 251 provides that "[a] motion for continuance shall not be granted except for sufficient cause supported by an affidavit, consent of the parties, or by operation of law." When a party's continuance motion is not in writing and verified, "it will be presumed that the trial court did not abuse its discretion" by denying it. *In re J.S.*, No. 2-04-277-CV, 2005 WL 1693537, at *2 (Tex. App.—Fort Worth July 21, 2005, no pet.) (mem. op.). Mother made an oral motion for continuance at the start of trial but did not file anything in writing. The trial court therefore did not abuse its discretion by denying the motion. *See id.*; *see also In re I.B.*, No. 02-21-00358-CV, 2022 WL 1257133, at *3 (Tex. App.—Fort Worth Apr. 28, 2022, no pet.) (mem. op.). We overrule Mother's second issue.

## Conclusion

Having overruled Mother's two issues and Father's dispositive second issue, we affirm the trial court's judgment.

---

[14]Mother points out in her brief that she did not sign her service plan until about a month before trial. However, the caseworker mailed a copy of the service plan to Mother in November 2021, and Mother told the caseworker that she had received it; even after Mother signed the plan, she did not attempt to work her services; and from the time the case began, she did not keep any of her appointments to visit Matthew. Further, Mother was represented by counsel as of September 2021, and the caseworker testified about her many attempts to find Mother to get her to participate in the case and her difficulty in getting Mother to respond to phone calls and text messages.

/s/ Mike Wallach

Mike Wallach

Justice

Delivered:  September 29, 2022